MORRIS COUNTY LAND IMPROVEMENT COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. THE TOWNSHIP OF PARSIPPANY-TROY HILLS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT, AND THE ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF PARSIPPANY-TROY HILLS, DEFENDANT.

Argued March 18 and 19, 1963—Decided July 23, 1963.

540

*Mr. John T. Dolan* argued the cause for plaintiff-appellant (*Messrs. Crummy, Gibbons & O'Neill,* attorneys; *Mr. Dolan,* of counsel).

*Mr. Herbert S. Glickman* argued the cause for defendant-respondent (*Messrs. Scerbo, Hegarty, Mintz, Glickman, Kobin & Howe,* attorneys; *Mr. Glickman,* on the brief).

The opinion of the court was delivered by

HALL, J. The fundamental question in this case is the constitutional validity of provisions of defendant township's zoning ordinance which greatly restrict the use of swampland and have for their prime object the retention of the land substantially in its natural state, essentially for public purposes. The provisions not only control land uses in the district, but also strictly regulate any reclamation or improvement of land therein. The Law Division sustained the provisions in a prerogative writ action brought by the plaintiff, a land owner within the area. We certified its appeal on our own motion before it was heard in the Appellate Division.

Parsippany-Troy Hills is a large, sprawling township in Morris County, with a great quantity of vacant land, which has in late years undergone very considerable development activity, accompanied by concomitant increase in population, with the usually resultant problems of planning and zoning. A fuller description of the municipality and a chronology of

land use regulation therein may be found in *Newark Milk and Cream Co. v. Township of Parsippany-Troy Hills*, 47 *N. J. Super.* 306, 321–327 (*Law Div.* 1957).

The particular area here involved is a large swamp of 1,500 or more acres known as Troy Meadows. It is located mostly in the southeasterly corner of the township extending to some extent easterly into East Hanover Township and to a slight degree southerly across the boundary of Hanover Township. It and other similar formations in nearby municipalities represent the remaining parts of what was once Lake Passaic, a huge body of water formed eons ago by action of the last glacier in blocking the original channel of the Passaic River. Now, Troy Meadows slowly drains, by means of small streams and man-made ditches running through it, into tributaries of the present Passaic River and forms a portion of that river's basin.

As might be expected, the elevation of the area is low in relation to the surrounding land and considerably below the grade of the roads encircling or running through it. The terrain is typical swampland, with a high water table and marsh grass and cattail vegetation. The surface soil is black or dark brown muck and peat, two to six feet deep, wet and very unstable. The second stratum, from two to four feet in thickness, consists of clay and silt materials which drain poorly and are highly compressible in nature. The bottom layer is composed of sand and gravel, found, on the average, seven or eight feet beneath the surface. The testimony in the case is uncontradicted that the two top layers will not bear structures, are unsuitable for fill and would have to be removed and the land filled with proper material before it could be used for any active purpose, except possibly the raising of fish or the growing of aquatic plants.

At the present time, there are practically no active land uses in the Parsippany-Troy Hills portion of the area. About 75% of it is owned by Wildlife Preserves, Inc. (Wildlife), a private noncommercial, but tax-paying corporation, interested in conservation and preservation of the natural state of the

area as a public or *quasi*-public wildlife sanctuary and nature study refuge. This organization has been energetic and apparently quite influential in urging the local authorities to restrict use of all of the land accordingly. It has even opposed filling of any of the land on the basis that the effect of the fill on the water would be biologically adverse to the conservation of wildlife.

There is no doubt that the area in its present state, acting essentially as a sponge, constitutes a natural detention basin for flood waters in times of very heavy rainfall, which would otherwise run off more quickly and aggravate damaging flood conditions occurring with some frequency in municipalities farther down the Passaic River valley. During such periods, Troy Meadows itself is flooded to some extent, but apparently with little, if any, effect on surrounding higher land.

Plaintiff's property consists of 66 acres in the lower corner of the meadows, fronting several hundred feet on Perrine (or Troy) Road, a dirt highway which is the boundary line in this section with Hanover Township. This acreage is part of a large tract, the balance of which is located across the road in Hanover. The entire parcel was acquired in 1952. The Hanover portion consisted mostly of high land, with a small amount of swamp near the road. At the time of acquisition and since, it has been zoned for industrial use. Plaintiff operates a sand and gravel business at the location in Hanover and has filled in the swampy portion of its property in that township with overburden and other unusable material from the sand and gravel pit.

At the time of acquisition, plaintiff's 66 acres in Parsippany-Troy Hills, along with the rest of Troy Meadows, was zoned, like the high land to the west, in the most restrictive residential classification under the township's original zoning ordinance adopted in 1945. The validity of the inclusion of the swamp in such a zone is indeed most doubtful, but apparently it was never attacked and, since no one would build an expensive home in a marsh, it served the practical purpose of precluding all development.

In 1954 an amendment to the zoning ordinance established "The Indeterminate Zone Classification * * * to cover such parts of the Township as Troy Meadows, where the nature of the land is such that its most appropriate future use is dependent on decisions by others than the government of the Township, such as with respect to flood control, and any change of present use and condition should be subject to special and individual consideration." The amendment forbade any new use, or change in existing use except for agricultural purposes or the growing of fish, water fowl and water plants, and also forbade any dumping or other disposal of material or any change in the natural or existing grade of the land, without the obtaining of a special permit from the Township Committee. From the evidence in the instant case, it is apparent that these almost "freezing" regulations were enacted as a stopgap or interim measure with the expectation or hope that higher governmental authority might well acquire the area as part of a large and much discussed flood control project to benefit the entire Passaic Valley—a project which has not yet come to pass.

Plaintiff attempted no utilization whatever of its Parsippany-Troy Hills land from 1952 until June 1959 when it commenced to fill along the edge of the road with overburden and excess material from the gravel pit operation, without obtaining any permit. Wildlife made a complaint against it in the Municipal Court for violation of the indeterminate zone regulations. While the complaint was pending, plaintiff unsuccessfully applied to the governing body to rezone its property for industrial use. Thereafter, in January 1960, plaintiff was granted a limited permission by the Township Committee to place fill to a depth of 300 feet from Perrine Road at its own risk, since the matter of the revision of land uses in the area was then under study by the township. This permission was conditioned upon submission to, and approval by, the Township Engineer of a sketch showing grades. Plaintiff resumed filling, but did not submit the sketch.

In March 1960, after an extended consideration of the meadows area by planning consultants and township officials, the indeterminate zone provisions were repealed and a new zoning classification created for the area under the title "Meadows Development Zone." The first paragraph of the new regulations set forth the purpose:

"The Meadows Development Zone classification is established to be applied to areas of the Township with a high water table. These areas can perform a function for the Township of Parsippany-Troy Hills, if they are properly regulated in their uses. Therefore, the following special regulations become necessary to provide for the most appropriate uses of land in the district which will permit development in harmony with its character and the regional requirements for the area."

The new regulations permitted the following uses as of right: agricultural uses; raising of woody or herbaceous plants; commercial greenhouses; raising of aquatic plants, fish and fish food (with a one-family dwelling as an adjunct to any of these uses, provided its lowest floor was a specified distance above flood level); outdoor recreational uses operated by a governmental division or agency; conservation uses "including drainage control, forestry, wildlife sanctuaries and facilities for making same available and useful to the public"; hunting and fishing preserves; public utility transmission lines and substations; radio or television transmitting stations and antenna towers; and township sewage treatment plants and water supply facilities.

The section went on to provide for what were designated as "uses which may be permitted as special exceptions by the Board of Adjustment under *R. S.* 40:55–39(b)," with the following preamble:

"* * * In determining whether a special exception shall be granted, the Board shall apply the standards set forth for each particular use and, in addition, shall determine that in its development and operation the proposed use will conform to the general purposes for which the district is established, and will not impair present or potential use of adjacent properties, as may be permitted under the terms of this section."

These so-called permitted uses amounted, for the most part, to strict regulation of land reclamation in aid of uses allowed as of right.[1] Thus, a special exception, with particular conditions, was required for any permitted use which involved a change in any drainage ditch, for the removal of earth products, such as gravel, sand, fill-dirt and peat, and for the diking, damming or filling of any land within the zone with an existing elevation of less than 175 feet above sea level (apparently this limitation would encompass practically all the land in the zone). The standards and conditions for exceptions to permit removal of earth products and filling included intricate site plan approval by the Planning Board together with studies and reports by other township officials and agencies before favorable action could be taken by the Board of Adjustment. Moreover, no filling was allowed except by the use of material taken from land within the zone. In addition, approval was required of ponds and lakes which would inevitably be created by a filling operation (since the fill had to

[1] It may be, although we need not pass upon the question, that the restrictions on land reclamation, in some aspects at least, exceed the proper bounds of a zoning ordinance as being beyond the general purposes and powers of zoning, *N. J. S. A.* 40:55-30, 31 and 32, and are more appropriately the subject of a separate non-zoning ordinance. If this be the case, they would amount to exercise of other aspects of the police power, see *e. g., R. S.* 40:48-1(21) and 40:48-2, akin to soil removal and excavation ordinances. See *Fred v. Mayor and Council of Borough of Old Tappan,* 10 *N. J.* 515 (1952); *L. P. Marron & Co. v. Township of Mahwah,* 39 *N. J.* 74 (1963); *Wulster v. Borough of Upper Saddle River,* 41 *N. J. Super.* 199 (*App. Div.* 1956), certif. denied 22 *N. J.* 268(1956). In this event, their validity would have to be tested accordingly, even though included in a zoning ordinance, and the provisions of the zoning enabling act authorizing the granting of variances, *N. J. S. A.* 40:55-39(c) and (d), and protecting nonconforming uses, *R. S.* 40:55-48, would have no application. As to the latter, *cf. Welsh v. Town of Morristown,* 98 *N. J. L.* 630, 633-635 (*Sup. Ct.* 1923), affirmed o. b., *sub nom. Welsh v. Potts,* 99 *N. J. L.* 528 (*E. & A.* 1924). For purposes of this case, it is sufficient that we assume all the Meadows Development Zone regulations to be properly included in the zoning ordinance.

come from within the zone and the only suitable material was the sand and gravel found below the first two strata of soil).

The removal of earth products from the zone, as a use in itself, previously permitted, became prohibited by an amendment of these provisions in June 1960. This forbade such removal on a commercial or profit basis and completely banned taking earth products beyond the boundaries of the zone.[2]

Plaintiff continued to fill its lands after the adoption of the Meadows Development Zone provisions, without municipal authorization, until further complaints made by Wildlife put an end to the work. By that time the fill extended 1,000 feet or more along the road to a depth of 150 feet or greater. It then applied to the Board of Adjustment in August 1960 for a special exception, allegedly in accordance with the ordinance, to fill its lands further as shown on a map submitted, to excavate for an 18-acre reservoir of unspecified depth, to use the material taken therefrom to supply the fill and to sell the excess to defray the cost of the operation. Since the application sought leave to do things forbidden by the ordinance, it amounted also to a request for variance. The application was ultimately denied in January 1961. This suit against the township and the Board of Adjustment followed.

---

[2] The amendment also required adherence to the requirements of the township's soil removal ordinance. This ordinance, adopted in 1956, is not contained in the record, so the full extent of the intended interplay with the meadows zone provisions is not known to us. An amendment, passed in July 1960, was introduced in evidence, however. It absolutely prohibited the excavation or removal of earth, clay, rock, sand, gravel, top soil or soil for sale or for use other than on the premises from which taken, except in connection with the construction of buildings and in certain other instances not here pertinent. We presume the purpose of the amendment was to take out of the soil removal ordinance the usual provision found in such enactments allowing soil removal from premises upon the grant of a permit by municipal authorities, see *L. P. Marron & Co. v. Township of Mahwah*, 39 *N. J.* 74 (1963), and thus to coincide with the meadows ordinance provision prohibiting removal from the zone, as well as adding the further restriction against removal from the particular premises. Since no attack is made on the amendment to the soil removal ordinance, we need not specifically consider it further.

The complaint asserted three causes of action, the first two against the township. The first count charged, in effect, that the Meadows Development Zone provisions of March 1960 and the June 1960 amendment thereto amounted to a taking of plaintiff's property without compensation and sought a declaration that they were unconstitutional and void. The second asked for an adjudication that plaintiff had acquired a nonconforming use of vacant land prior to the adoption of the meadowland zone provisions. The third count, directed against the Board of Adjustment, demanded that that body's refusal to grant the special exception to fill and excavate be set aside as unreasonable and arbitrary.

Taking the last count first, the trial judge held that the Board's action was not arbitrary or unreasonable and found a clear inference that the application to excavate for the 18-acre reservoir and to fill the land was in reality an attempt to extend plaintiff's sand and gravel business from across Perrine Road in Hanover Township to its land in the meadows by utilizing the unsalable material from the reservoir excavation to fill the remaining land and selling the marketable sand and gravel therefrom in its usual course of business. Plaintiff has not appealed from this portion of the judgment so this phase of the case need not be discussed further. We note in passing that the Board of Adjustment was very properly represented by separate counsel in the trial court.

Plaintiff has raised a question not presented below which may well be disposed of at this juncture. It contends that a visit to the locale by the trial judge without notice to or the accompaniment of counsel constitutes reversible error as a matter of law. The testimony in the case had been concluded in the afternoon and court was adjourned until the next day when the judge was to render his oral decision. After adjournment the judge inspected the area in the company of a court officer, a native of the vicinity. The next morning he advised counsel of his visit, and put his observations on the record as a viewing judge is always under a duty to do, inquiring whether there were any corrections or com-

ments. Plaintiff's counsel made no objection nor said anything.

[2] We see no merit whatever in the contention. It is obvious from the court's report of his view that the object of the visit was only to better understand the evidence. There is no question of the right of a trial judge sitting without a jury to inspect a site for this purpose. *Peoples Trust Company v. Board of Adjustment of Borough of Hasbrouck Heights*, 60 *N. J. Super.* 569, 576 (*App. Div.* 1959). Indeed, in many types of cases involving physical facts which may not be clearly portrayed by the spoken word, it is most desirable, if not almost imperative, that he do so, particularly where, as here, no photographs or meaningful maps were included in the proofs. The judge must not, however, under the present law in this State governed by the principle of the exclusiveness of the record, base his decision on facts ascertained from his personal inspection. *Second Reformed Church v. Board of Adjustment of Borough of Freehold*, 30 *N. J. Super.* 338 (*App. Div.* 1954).

■ We find nothing in the trial court's report of his visit or in his oral opinion indicating in the slightest that he learned or relied upon facts *dehors* the proofs. Plaintiff does not point to anything contrariwise, but suggests there is no way of knowing for certain and that the possibility can only be avoided by a reversal. In effect, this position would practically preclude any view of a locale made by a trial court sitting without a jury. A judge must be relied upon to have made full disclosure as to the scope and results of his inspection. "* * * [W]e must assume that every judge * * * places truth above pride, and will shun the burden of conscious wrong. The judicial process depends upon that faith." *State v. LaPierre*, 39 *N. J.* 156, 164 (1963). While a judge should not make an inspection without giving all counsel notice of his intention and the opportunity to be present, there was no prejudicial error in this case.

Next to be considered is plaintiff's claim that it acquired a valid nonconforming use prior to the adoption of the Meadows Development Zone provisions in March 1960. This contention rests upon the filling of a small portion of its lands between June 1959 and March 1960 and the alleged invalidity of the 1954 indeterminate zone classification, which forbade even land reclamation without a special permit. (The permit for limited filling granted plaintiff in January 1960 under the indeterminate zone provisions is of no help to it since it admittedly did not comply with the prerequisite specified therein). The trial court found it unnecessary to pass upon the validity of the 1954 ordinance provisions, since it held that the land filling did not constitute a use within the contemplation of *R. S.* 40:55–48, permitting the continuance of nonconforming uses or structures existing at the time of passage of a zoning ordinance.

■■ There are many reasons why plaintiff's claim cannot be sustained. We need only mention that given by the trial court, which is unquestionably sound. Filling land otherwise not usable is obviously not in and of itself an "existing use" of it in the statutory sense; here it amounted, at most, only to preparation for some indefinite and conjectural future use. Plaintiff's evidence conceded as much, its vice-president testifying: "We hadn't made any use at the time. We were aiming to make a use of it." The aimed use was "[t]o improve the land for industrial purposes." This is clearly not enough to come under the statutory umbrella. "* * * [I]t is an existing *use occupying* the land, that the statute protects; the statute does not deal in mere intentions." *Marlin v. Cestone,* 33 *N. J. Super.* 267, 269 *(App. Div.* 1954) ; *Ardolino v. Florham Park Board of Adjustment,* 24 *N. J.* 94, 104 (1957).

This brings us to the important and decisive question in the case—the matter of the validity of the 1960 Meadows Development Zone provisions. Plaintiff's attack is full-scale and is not confined to unconstitutional effect of the regula-

tions as applied to its property. The trial court decided the issue this way:

"There is no question at all but that the township governing council was conscious of the physical nature of this area and that it was concerned about the danger of flooding. There is a limit to fill without adequate safeguards. The ordinance here is predicated on the physical nature of the area to a substantial extent. The land at the present time is not suitable for any intensive use.

\* \* \* \* \* \* \* \*

\* \* \* I am mindful of the cases cited by the plaintiff which condemn action by a municipality through zoning to, in effect, acquire lands for public use. That is what the contention of the plaintiff here is, that this ordinance, in effect, is designed to aid flood control in the area at the expense of the plaintiff \* \* \*

But I think that considering the entire problem presented, considering the nature of the immediate and the surrounding area, that the presumption of validity has not been overcome by the plaintiff and I will hold that the ordinance represents a reasonable exercise of the power to zone."

We find ourselves in fundamental disagreement with this conclusion.

There cannot be the slightest doubt from the evidence that the prime object of the zone regulations is to retain the land substantially in its natural state. As we have already said, the testimony is uncontradicted that the character of the surface soil is such that it is unsuited for any of the permitted active uses, except possibly the raising of fish and aquatic plants. The first two layers would have to be removed and replaced with proper fill which would support structures where the use involved the construction of buildings, and with appropriate top soil where agriculture and similar soil uses were contemplated. And land reclamation along these lines is, for all practical purposes, rendered impossible. Apart from the matter of having to obtain permission subject to exceedingly difficult conditions, the regulations absolutely prohibit not only the removal of the unusable top two layers of earth from the zone (and, indeed, even from the particular premises within the zone under the amendment to the soil removal ordinance), but also forbid the importation from out-

side the zone of suitable fill material or soil. As a practical matter, the only available method seems to be to dredge fill material from the bottom stratum of sand and gravel in some other portion of the premises (which, however, does not have the qualities of fertile top soil) and to fill the excavation as far as possible with the unusable upper layers from the area being excavated and filled. Even then it appears that a pond or lake would probably result in the unfilled portion of the excavation because of the high water table. And the regulations also require approval of such a formation. Moreover, the regulations further provide that earth removal will be permitted only if it "will not impair the present and potential use of adjacent properties." This might well become another block to any land reclamation since, it will be recalled, Wildlife has objected to any filling on the ground of an adverse biological effect on the water and the swamp creatures in its sanctuary.

In addition, it will be noted that many of the previously listed permitted uses in the zone are public or *quasi*-public in nature, rather than of the type available to the ordinary private landowner as a reasonable means of obtaining a return from his property, *i. e.*, outdoor recreational uses to be operated only by some governmental unit, conservation uses and activities, township sewage treatment plants and water facilities and public utility transmission lines, substations and radio and television transmitting stations and towers. All in all, about the only practical use which can be made of property in the zone is a hunting or fishing preserve or a wildlife sanctuary, none of which can be considered productive.

One has to conclude that the uses to which a private landowner may put his property in the zone under the 1960 regulations are little more favorable to him than the almost "freezing" provisions which controlled the area when subject to the stop-gap Indeterminate Zone regulations. One also has the strong feeling that the ordinance changes made in 1960 were adopted essentially, not to benefit the landowner or to permit practical change in the natural state of the area,

but rather because it was considered, and quite properly so, that the indeterminate zone provisions were or had become invalid for any number of reasons.

It is equally obvious from the proofs, and legally of the highest significance, that the main purpose of enacting regulations with the practical effect of retaining the meadows in their natural state was for a public benefit. This benefit is twofold, with somewhat interrelated aspects: first, use of the area as a water detention basin in aid of flood control in the lower reaches of the Passaic Valley far beyond this municipality; and second, preservation of the land as open space for the benefits which would accrue to the local public from an undeveloped use such as that of a nature refuge by Wildlife (which paid taxes on it).

This prime public, rather than private, utilization can be clearly implied from the purpose sections of the zone regulations previously quoted. And it is established beyond any question by the testimony of the township's own witnesses. The Chief Engineer and Acting Director of the Division of Water Policy and Supply of the State Department of Conservation and Economic Development testified, in effect, that the ordinance provisions were soundly and reasonably conceived from the scientific standpoint to accomplish this flood alleviation purpose. He said that artificial filling of natural retention storage areas automatically increases the magnitude and volume of flood downstream and that limiting excavation to the area would result in retention of the capacity for natural storage. He was careful to point out, however, "that there is such a thing as an abuse of zoning police power. * * * [W]hen land is acquired for some specific purpose it is not proper necessarily to do it through the zoning police powers but should be done through purchase."

The township's expert planning consultant, who made the area studies and drafted and recommended to the municipal council the Meadows Development Zone ordinance provisions adopted in March 1960, testified that one of the main considerations was the vital function the area serves as a

detention basin "in flood control in the overall Passaic Valley region"—and that another was to retain its natural state to "provide necessary open space, green space, in the developing of the suburban area." The Assistant Director of the Morris County Planning Board, who had also made studies of the area incorporated in a report and recommendations to the township, testified similarly and said, in effect, that this township was fortunate because Wildlife had acquired considerable amounts of property which were being utilized in a passive type of recreational use, whereas other municipalities "would have to go out and buy it." Both men spoke of consultation with Wildlife and virtual adoption of the views and area uses suggested by that organization in arriving at their recommendations. It is fair to conclude from the proofs that any other factors which were taken into consideration in arriving at the detailed regulations were clearly subordinate to these two public purposes.

 Private property may not, of course, be taken for public use without just compensation. *N. J. Const., Art. I, par.* 20. The measures here adopted to accomplish public benefits do not amount to a direct or outright taking, as were those struck down in *Grosso v. Board of Adjustment of Millburn Township,* 137 *N. J. L.* 630 (*Sup. Ct.* 1948), where use of the plaintiff's property was precluded by placing the lot in the bed of a proposed street on the official map; in *Hager v. Louisville & Jefferson County Planning & Zoning Commission,* 261 *S. W. 2d* 619 (*Ky. Ct. App.* 1953), where the plaintiff's land was rendered useless by zoning it as ponding areas for temporary storage basins in accordance with a flood control plan; and in *Miller v. City of Beaver Falls,* 368 *Pa.* 189, 82 *A. 2d* 34 (*Sup. Ct.* 1951), where private utilization of the tract was inhibited for a period of years, pursuant to a statute, by its inclusion in a territory encompassed by an ordinance adopting a general plan for present and future parks.

But a taking may as well occur indirectly through excessive regulation under the police power. Thus, in *Yara Engineer-*

*ing Corp. v. City of Newark,* 132 *N. J. L.* 370 *(Sup. Ct.* 1945), a so-called airport zoning ordinance, which restricted the height of structures within designated distances of an airport and otherwise regulated use of such property so as not to endanger or interfere with the landing or takeoff of aircraft, was held unconstitutional as amounting to an appropriation of rights in private property which could only be acquired by eminent domain. And in *Joint Meeting of the City of Plainfield v. Borough of Middlesex,* 69 *N. J. Super.* 136 *(Law Div.* 1961), defendant zoned plaintiff's property exclusively for school, park and playground use as a method of depreciating its value for purposes of municipal purchase. The zoning was held invalid as unconstitutionally depriving the owner of the full value of its property. The universal truth of the pithy observation of Mr. Justice Holmes in *Pennsylvania Coal Co. v. Mahon,* 260 *U. S.* 393, 415, 43 *S. Ct.* 158, 160, 67 *L. Ed.* 322, 326 (1922), must not be disregarded:

"The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

While the issue of regulation as against taking is always a matter of degree, there can be no question but that the line has been crossed where the purpose and practical effect of the regulation is to appropriate private property for a flood water detention basin or open space. These are laudable public purposes and we do not doubt the high-mindedness of their motivation. But such factors cannot cure basic unconstitutionality. Nor is the situation saved because the owner of most of the land in the zone, justifiably desirous of preserving an appropriate area in its natural state as a wetland wildlife sanctuary, supports the regulations. Both public uses are necessarily so all-encompassing as practically to prevent the exercise by a private owner of any worthwhile rights or bene-

fits in the land. So public acquisition rather than regulation is required. See Dunham, "Flood Control Via the Police Power," 107 *U. Pa. L. Rev.* 1098 (1959); Krasnowiecki and Paul, "The Preservation of Open Space in Metropolitan Areas," 110 *U. Pa. L. Rev.* 179, 184–189 (1961); Note, "Techniques for Preserving Open Spaces," 75 *Harv. L. Rev.* 1622 (1962); and, generally, Dunham, "A Legal and Economic Basis for City Planning," 58 *Colum. L. Rev.* 650, 658–670 (1958). *Cf. Alford v. Finch*, 155 *So. 2d* 790, 32 *L. W.* 1030 (*Fla. Sup. Ct.* 1963).[3] Our statutes empower the State and its subdivisions to purchase or condemn property needed for flood control, see *e. g., N. J. S. A.* 58:16A–1 *et seq.*, and *N. J. S. A.* 40:69–4.1 *et seq.*, and that found desirable for open space, park, playground, conservation and recreation purposes, see *e. g., R. S.* 40:61–1 and *N. J. S. A.* 13:8A–1, *et seq.* (New Jersey Green Acres Land Acquisition Act of 1961). And the federal government has provided for grants to states in aid of open space programs. 42 *U. S. C. A.* § 1500–1500e.

■ We cannot agree with the trial court's thesis that, despite the prime public purpose of the zone regulations, they

---

[3] There is no substantial evidence in this case that the matter of intra-municipal flood control had any bearing on the adoption of the meadows zone regulations. It does not appear that the rise in the water level in the meadows in times of heavy rainfall affected any other area in the township. The emphasis was on permitting that rise within the area as a detention basin for the benefit of lower valley sections rather than on any effort to prevent or channel it. This case, therefore, does not involve the matter of police power regulation of the use of land in a flood plain on the lower reaches of a river by zoning, building restrictions, channel encroachment lines or otherwise and nothing said in this opinion is intended to pass upon the validity of any such regulations. See *e. g., R. S.* 58:1–26 and *N. J. S. A.* 40:56–1(*o*). See, generally, Dunham, "Flood Control Via the Police Power," 107 *U. Pa. L. Rev.* 1098 (1959); *Water Resources Circular 3, Flood Damage Alleviation in New Jersey*, Department of Conservation and Economic Development, Division of Water Policy and Supply (1961); Beuchert, "Zoning on the Flood Plain," 49 *A. B. A. J.* 258 (1963). *Cf., Vartelas v. Water Resources Commission*, 146 *Conn.* 650, 153 *A. 2d* 822 (*Sup. Ct. Err.* 1959).

are valid because they represent a reasonable local exercise of the police power in view of the nature of the area and because the presumption of validity was not overcome. In our opinion the provisions are clearly far too restrictive and as such are constitutionally unreasonable and confiscatory. As was said in *Kozesnik v. Montgomery Township*, 24 *N. J.* 154, 182 (1957) : "That a restraint against all use [for the benefit of another private land owner] is confiscatory and beyond the police power and statutory authorization is too apparent to require discussion." (Insertion ours) The same result ordinarily follows where the ordinance so restricts the use that the land cannot practically be utilized for any reasonable purpose or when the only permitted uses are those to which the property is not adapted or which are economically infeasible. *Gruber v. Mayor and Township Committee of Raritan Township*, 39 *N. J.* 1, 12 (1962) ; *Arverne Bay Construction Co. v. Thatcher*, 278 *N. Y.* 222, 15 *N. E. 2d* 587, 117 *A. L. R.* 1110 (*Ct. App.* 1938). Judge Lehman's oft-quoted sentence in the latter case epitomizes the situation : "The only substantial difference, in such case, between restriction and actual taking, is that the restriction leaves the owner subject to the burden of payment of taxation, while outright confiscation would relieve him of that burden." (15 *N. E. 2d,* at *p.* 592.) Of course, property need not be zoned to permit every use to which it is adapted nor must all property similarly situated be accorded identical treatment. To so require would frustrate the zoning objective of a well-balanced community according to a comprehensive plan. It is sufficient if the regulations permit some reasonable use of the property in the light of the statutory purposes. See *Kozesnik v. Montgomery Township, supra* (24 *N. J.,* at *p.* 172).

We need not repeat the nullifying effect of the use and soil reclamation restrictions on any productive use of property in the zone, which is apparent on the face of the ordinance when viewed in the light of the explanatory testimony. Without reclamation, nothing but a passive use is possible. Land improvement is rendered practically impossible by the almost

prohibitory filling and removal regulations, and, even if it could be attained, permitted private owner uses are most narrow indeed. The case is unique in that reclamation is necessary before any worthwhile use is possible, except the commercial removal of the sand and gravel natural resource. Certainly where land improvement can be accomplished under reasonable regulations and some productive uses, otherwise impossible, are thereby made feasible, a municipality is not justified in practically prohibiting all reclamation, thereby preventing a private owner from obtaining any return on his property. While the record here is sparse as to what reasonable productive uses could follow reclamation, we feel confident there must be some which could properly be allowed under appropriate regulation protecting other property in the meadow zone and land in adjoining zones from adverse impact. For example, as to plaintiff's land, there was no refutation of its contention that industrial use was feasible after filling, in view of the similar zoning across the boundary in Hanover and the means of access by roads from both that and East Hanover Townships. Land filling could very likely be accomplished under less stringent regulations which would still protect adjoining property and any properly recognizable broader local interest from harm. Natural resource removal under reasonable regulation might also be considered. See *Kozesnik v. Montgomery Township, supra* (*24 N. J.*, at *pp.* 167–168). But these are matters for determination by the local legislative body rather than a court in the first instance. The point for present purposes is that the Meadow Development Zone provisions were enacted to prevent private productive use and to maintain the natural state of the land rather than to seek and adopt reasonable means and conditions under which the area could be safely and properly developed by those private owners desiring and entitled to do so.

It is certainly no answer at all to the basic deficiencies in the regulations to assert, as the township does, that they are sanctioned merely because they bear superficial relation to some of the essential considerations for valid zoning specified

in *R. S.* 40:55–32—*viz.* "consideration \* \* \* [of] the character of the district and its peculiar suitability for particular uses"; prevention of the overcrowding of land; avoidance of undue concentration of population; and as a preventive measure against flooding—and because they represent a local legislative decision compatible with statutory purposes and applicable uniformly to all property similarly situated.

The Meadow Development Zone provisions of March 1960 and the amendment thereto in June 1960 were enacted as a unified whole. It is quite impossible or at least impracticable, even if a proper function or responsibility of a court, to attempt to sift any wheat from the chaff and pick out certain uses or certain land reclamation provisions which might individually be valid. That which thereby could be saved would be so fractional and incomplete as not to amount to a comprehensive, reasonable regulation of the area. Therefore we must hold the provisions invalid in their entirety. .

This result, in effect, leaves the area unzoned. The Indeterminate Zone provisions were intended only as a stopgap and were repealed. The original zoning classification in the most highly restricted residential zone amounted, for all practical purposes, to a prohibition of all uses and, if attacked, could hardly be expected to stand. The absence of all regulation would permit the establishment of any use by any means—a result which might well be damaging to the overall local public interest entitled to be served by appropriate exercise of the police power in the light of the special characteristics and particular problems of the district. Consequently we deem it proper for the judgment to be entered by the Law Division to direct that it not become effective for such period of time as the trial court shall find reasonably necessary to enable enactment of new and proper regulations for the area. See, *Newark Milk and Cream Co. v. Township of Parsippany-Troy Hills, supra* (47 *N. J. Super.,* at *p.* 331).

The judgment of the Law Division is reversed and the cause remanded for the entry of a judgment consistent with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.