173 N.J. Super. 311 (1980)
414 A.2d 280
JACK USDIN AND CHARLES HIRSCH, PLAINTIFFS,
v.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, DIVISION OF WATER RESOURCES, DEFENDANT.
Superior Court of New Jersey, Law Division  Middlesex County.
Decided March 28, 1980.
*314 Michael A. Cerreto for plaintiffs (Cerreto & LaPenna, attorneys).
William J. Stohler, Deputy Attorney General, for defendant (John J. Degnan, Attorney General of New Jersey, attorney).
HARDING, J.S.C.
The issues before the court concern whether state administrative land use regulations, applicable to the designation of plaintiffs' land as a floodway, for a four-year period, is a "taking" of property in the constitutional sense, and, if so, what is the appropriate remedy. The first issue appears to be novel in New Jersey.
Plaintiffs' complaint originally sought a declaration that the enabling legislation, N.J.S.A. 58:16A-50 et seq., and regulations promulgated by the Department of Environmental Protection (DEP), Division of Water Resources, N.J.A.C. 7:13-1.1 et seq., were unconstitutional. At trial plaintiffs conceded that the subject legislation and regulations were constitutionally valid; such contentions are now resolved. In any event, jurisdiction to review the propriety of a decision or action or rule of a state agency originates in the Appellate Division of the Superior Court, rather than this court. R. 2:2-3(a).
On August 23, 1968 plaintiffs acquired a vacant tract of about seven acres, triangular in shape, having an average depth of 575' and a width of 1150', which parallels a 50' railroad right-of-way which, in turn parallels Metuchen Road. The property has water and electricity available, but lacks gas and sewer lines which could be brought in from Metuchen Road. That road is paved to within 300' of the property. Access would require the additional paving of Metuchen Road and construction of an access road across the railroad's property, for which permission *315 has already been obtained. The property is zoned for heavy industrial uses, which include office buildings, research laboratories, light and heavy manufacturing, the storage of building materials, fuels and similar matter, and retail sales. Junk yards and residential uses are prohibited. The generally surrounding properties have been 50%-70% developed. A heavy industrial use would be the highest and best use of the site.
In February 1973 the DEP proposed certain acreage, including this site as within a "floodway." This designation was officially adopted on May 21, 1973. In mid-1973 plaintiffs had a professional prepare an evaluation of subsurface conditions and perform other preliminary site work, which noted that the property was situated in a "floodway." In December 1974 a DEP official wrote to plaintiffs' counsel stating that because of the "floodway" designation "no construction will be permitted." That author acknowledged he did not know of any exception to the bar against construction, but invited plaintiffs to submit their plans and encroachment application to the Water Policy and Supply Council. Plaintiffs ignored the invitation.
Effective June 2, 1975 the DEP promulgated land use regulations applicable to "floodways," N.J.A.C. 7:13-1.1 et seq. The enabling legislation provided:
"It is in the interest of the safety, health, and general welfare of the people of the State that legislative action be taken to empower the Division of Water Resources to delineate and mark flood hazard areas, to authorize the Department of Environmental Protection to adopt land use regulations for the floodway, and to coordinate effectively the development, dissemination, and use of information on floods and flood damages that may be available. [N.J.S.A. 58:16A-50]
........
The department is authorized to adopt, amend and repeal rules and regulations concerning the development and use of land in any designated floodway which shall be designed to preserve its flood carrying capacity and to minimize the threat to the public safety, health and general welfare. [N.J.S.A. 58:16A-55]
*316 A floodway was defined as:
... [T]he channel of a natural stream and portions of the flood plain adjoining the channel, which are reasonably required to carry and discharge the flood water or flood flow of any natural stream. [N.J.S.A. 58:16A-51(d)]
The regulations prohibit, within floodways, the erection of a structure for occupancy at any time for humans or livestock, the storage of materials or equipment, and the depositing of any solid waste. N.J.A.C. 7:13-1.4. Permitted uses include lawns, gardens, play areas, recreation fields and lands for cultivating crops or plants or for the grazing of animals, provided such uses did not require the importation of fill nor the erection of a structure or the impeding of water flow. N.J.A.C. 7:13-1.5. The regulations further provide that all other uses should be sanctioned through stream encroachment permits (N.J.S.A. 58:1-26 et seq.), although permits would not be issued for any prohibited uses. N.J.A.C. 7:13-1.6 and 7:13-1.4(d). The regulations did provide an appeal mechanism upon a showing of hardship, to facilitate the limited rebuilding of a preexisting prohibited use. N.J.A.C. 7:13-1.4(c).
In the Fall of 1975 counsel for plaintiffs inquired of the borough building inspector whether a building permit could be issued. The official responded that a permit would be refused because of the DEP's designation. Nevertheless, on January 22, 1976 plaintiff filed an application to build a 30,000 sq. ft. warehouse, a permitted use under local zoning. A variance would be required because the property lacked street frontage. Plaintiffs had limited building plans but they were not required by the borough. Rather, the building inspector wrote plaintiffs on January 26, "[Y]our application for a building permit must first be approved by the Department of Environmental Protection, Division of Water Resources, State of N.J. before any action can be taken by the Borough, as your land is located in the flood hazard area." Presumptively, the building inspector had in mind a stream encroachment permit, N.J.S.A. 58:1-26 et *317 seq., and as modified by N.J.A.C. 7:13-1.6 and 7:13-1.4(d). Plaintiffs never applied for any state approval. The land remains fallow today.
On June 2, 1979 the DEP redesignated plaintiffs' property from a "floodway" to a "flood fringe" area because of refinements in technology and topographical changes of surrounding properties. The prohibited uses of the Administrative Code do not apply to "flood fringe" areas. Plaintiffs' complaint originally sought that the State be required to institute condemnation proceedings. Because of the DEP's 1979 redesignation, plaintiffs alternatively now seek money damages.
Utilizing the comparative sales approach, plaintiffs' expert testified that the land, regulated only by the zoning ordinance, over any period at issue, is valued at $22,000 an acre, or a total of $154,000. Plaintiffs contend that the state prohibited uses rendered the property substantially useless, having only a total $17,500 value to a land speculator.[1] Plaintiffs calculated damages by using a constant 10%[2] of the full land value, as the lost annual rental value. To the lost annual rental value plaintiffs added the actual taxes paid for the given year.[3] These totals are the claimed damages. According to plaintiffs, if the taking occurred when plaintiffs learned the property was designated a floodway and the temporary taking continued until the designation was lifted December 13, 1974 to June 2, 1979, the damages are $78,610; if the taking occurred when the prohibited "floodway" uses became effective, June 1, 1975 to June 2, 1979, the damages are $70,380; if the taking occurred when plaintiffs *318 actively sought development which the building inspector denied because of the State's prohibition, January 26, 1976 to June 2, 1979, the damages would be $59,971.
Defendant's valuation of damages, also using a comparative sales approach, was more modest. Without considering the effects of the State's use regulation and acknowledging an industrial use as the most appropriate, defendant urges that in 1975 the seven-acre site was worth $15,000 an acre, or $105,000. Its value would increase annually, at the rate of 7.5%, so that in 1979 the tract would be worth $20,000 an acre, or $140,000. Considering the use regulations for a floodway, the State agreed that the property's total value decreased to $17,500, which would stay constant over the years. The State took a credit for this residual value, contending therefore that the loss in property value, due to the State regulations, in 1975 was $87,500; in 1976 was $95,400; in 1977 was $103,600; in 1978 was $112,700 and in 1979 was $122,500. The State agreed that 10% of these values was the proper factor to calculate damages in any given year. Therefore, without yet considering taxes paid, the State urges that plaintiffs were damaged in 1975 in the sum of $8,750; in 1976 the sum of $9,540; in 1977 the sum of $10,360; in 1978 the sum of $11,270, and in 1979 the sum of $12,250. Cross-examination of the State's expert revealed a dispute as to the proper apportionment of paid taxes between the land's residual value and its loss value. For the periods at issue the disputed amount was less than $1,000. I find that a factor determined from the quotient of the annual value of the land divided by the annual taxes paid, and the application of that factor annually to both the loss value and to the residual value of the property, is the fairest method of apportionment. Under the State's theory, as modified by the court's finding, the total loss to plaintiffs for the full year 1975 would be $10,152.63; if the taking occurred June 2, 1975 when the state regulations became effective, the loss for the last seven months of 1975 would be $5,929.29. The loss in 1976 would be $11,137.55; in 1977 the loss would be *319 $12,437.77, and in 1978 the loss would be $13,380.32. The total loss for the calendar year 1979 would be $14,440.30, but since the damage ended on June 2 when the property was redesignated, the loss for the first five months of 1979 would be $6,016.80. The totals for partial years 1975 and 1979, and full years 1976, 1977 and 1978, which is from the effective date of the regulation to June 2, 1979, is $48,897.73. If the taking occurred on December 13, 1974, the State has presented no evaluation for the calendar year 1974, but by extension, the total loss beginning January 1, 1975 through June 2, 1979 would amount of $53,125.07. If the taking occurred when plaintiffs sought a building permit on January 22, 1976 and continued through June 2, 1979, by extension of defendant's valuation the damages would total $42,301.96.
One of the classic constitutional confrontations concerns the interplay between the obligation of government to provide for the general welfare of its citizenry, U.S.Const., Art. I, § 8; N.J.Const. (1947), Art. I, par. 2; see also N.J.Const. (1947), Art. IV, § VI, par. 2, and the right of citizens to privately own property and be justly compensated when such right is taken away. U.S.Const. Amend. V; N.J.Const. (1947), Art. I, par. 20; see, also, N.J.Const. (1947), Art. IV, § VI, par. 3.
Without intending to trace the entire history of this conflict, it is necessary to survey where various courts have drawn the battle lines. Mr. Justice Holmes for the majority, and Mr. Justice Brandeis in dissent, championed different perspectives in the landmark case of Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). There, Mahon sought to prevent the mining of coal so as to remove support from under his house and cause a subsidence of the surface, despite a deed which conveyed only surface right to him and which waived his claims for damage resulting from mining rights reserved to the grantor. Mahon asserted the Kholer Act, which forbade mining in such a way as to undermine a structure used for habitation. *320 Holmes conceded that government could not function if to some extent, property values could not be diminished by a governmental act without requiring payment. Some values are enjoyed under implied limitations and must yield to "the police power," but the proposition must have limits or the rights to contract, to privately own property and to due process, disappear. Holmes saw the issue as upon whom the financial loss should properly fall; a person's misfortunes will not justify shifting the damages to his neighbor's shoulders. It is a question of degree, not resolvable through general propositions. Holmes concluded that since a single private house was involved, damages would not create a public nuisance and must not be commonly shared, even though others may be similarly situated. Further Mahon knowingly acquired only the surface rights, aware of potential injury from mining.
Brandeis agreed in general principle with Holmes, but made an additional distinction which required an opposite result. Brandeis viewed the legislation as protecting the public safety or health, not seeking to appropriate or devote the property for a public use. Preventing the use of property, which interfered with a paramount public right, could not be a compensable taking, even though it may deprive the owner of the only profitable use. Reciprocity of advantage, that is, the owner's right to benefit from property use as against benefits to be gained by the community at large, is an essential consideration only when governmental power is exercised to confer a benefit. Reciprocity is not relevant where police power is invoked to protect the public. Further, Brandeis believed that the state's duty to guard public safety could not be privately bargained away.
Brandeis' distinction was born when an earlier court wrote:
A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property *321 for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the State that its use by any one, for certain forbidden purposes, is prejudicial to the public interests . .. The power which the States have of prohibiting such use ... cannot be  burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. [Mugler v. Kansas, 123 U.S. 623, 668-9, 8 S.Ct. 273, 301, 31 L.Ed. 205, 212-3 (1887)]
In resolving this constitutional conflict in other factual settings, the Federal Supreme Court has not developed any rigid rules for determining when economic injuries caused by legitimate governmental conduct should be disproportionately borne by the property owner and when it should be publicly supported. Each case is judged on its own facts. United States v. Caltex Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952), reh. den. 344 U.S. 919, 73 S.Ct. 345, 97 L.Ed. 708 (1953). Takings were declared when government aircraft flew at low levels, United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); when a coal mine was seized to avert a nationwide strike, United States v. Pewee Coal Co., 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951), and when title to uncompleted vessels were involuntarily transferred despite outstanding liens, Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). Compensation was not required by a municipal zoning provision even though it deprived that owner of the property's most beneficial use, Goldblatt v. Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); where quartered troops destroyed housing, National Board of Y.M.C.A. v. United States, 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969), and where use restrictions were placed upon privately owned but designated historic landmarks, Penn Central Transp. Co. v. City of New *322 York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), reh. den. 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).
The most celebrated case in New Jersey, and frequently cited elsewhere, is Morris Cty. Land v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963). There the zoning ordinance of the municipality strictly regulated any use or development of privately owned swamp land. Permitted uses included agriculture, outdoor recreation, conservation projects and utility lines. Plaintiff applied for a special exception use to reclaim and fill its land, selling the excess fill to finance the operation. It was denied the variance. Plaintiff sued to void the ordinance as impermissively unreasonable or, alternately, to declare a taking. That court viewed the regulation as retaining the property in its natural state for a public benefit, both serving as a sponge for run-off water in aid of flood control for lands in the lower reaches of that valley beyond the municipality, and to enhance the public good by preserving a natural wildlife refuge. The court fashioned a test as to when the line is crossed between a valid exercise of police power or a governmental act of taking, simply as when the governmental conduct restricted the private use of the land from any reasonable purpose. It concluded that the permitted uses deprived that owner of any beneficial or feasible economic return. Since a taking had occurred, the zoning ordinance was declared unconstitutional. Implicit in that result is the holding that a taking may occur without physical intervention.
However the court did reserve certain governmental activity from the sweep of its holding when it noted:
There is no substantial evidence in this case that the matter of intra-municipal flood control had any bearing on the adoption of the meadows zone regulations. It does not appear that the rise in the water level in the meadows in times of heavy rainfall affected any other area in the township. The emphasis was on permitting that rise within the area as a detention basin for the benefit of lower valley sections rather than on any effort to prevent or channel it. This case, therefore, does not involve the matter of police power regulation of the use of land in a flood plain on the lower reaches of a river by zoning, building *323 restrictions, channel encroachment lines or otherwise and nothing said in this opinion is intended to pass upon the validity of any such regulations.... [Id. at 556, n. 3, 193 A.2d 242, n. 3]
Using Morris Cty. Land as a springboard, New Jersey courts quickly imported the concept into new areas. In Lomarch Corp. v. Englewood, 51 N.J. 108 (1968), where plaintiff applied for subdivision approval, a one-year municipal reservation for a park (pursuant to N.J.S.A. 40:55-1.32) required payment for the temporary taking. Cappture Realty v. Elmwood Park Bd. of Adj., 133 N.J. Super. 216 (App.Div. 1975), upheld a limited moratorium on construction in a flood-prone area, as breathing room to allow the municipality time to complete specific flood control projects. However, the court warned that unless the projects were expeditiously completed or the moratorium vacated, a real possibility existed that the point of taking would be reached and passed. In Washington Market Enterprises v. Trenton, 68 N.J. 107 (1975), the municipality declared plaintiff's property within a blighted area, as the first step toward acquisition. About five years later the project was abandoned. During the interim, and even before, the area surrounding plaintiff's land markedly deteriorated. At the time of abandonment plaintiff was able to attract only a few temporary tenants for its office building. Over a ten-year period rental income degenerated from $160,000 annually to $6,300. The court ruled that the threat of condemnation effectively destroyed the beneficial use which the owner could make of his property, and created a taking entitling plaintiff to money damages.
A caution flag on the expansion of this doctrine was raised in A.M.G. Associates v. Springfield Tp., 65 N.J. 101 (1974). There the issue more traditionally concerned the denial of a use variance, which the court discussed in terms of zoning land into idleness by restricting all reasonable uses. The variance was allowed. However, the court used the occasion to write in a footnote:

*324 It is to be emphasized that we deal in this case only with the split lot situation where there is a deprivation of all practical use of the smaller portion thereof. The approach to the taking problem and the result, may be different where vital ecological and environmental considerations of recent cognizance have brought about rather drastic land use restrictions in furtherance of a policy designed to protect important public interests wide in scope and territory; as for example, the coastal wetlands act N.J.S.A. 13:9A-1 et seq., and various kinds of flood plain use regulation. Cases arising in such a context may properly call for a reexamination of some of the statements 10 years ago in the largely locally limited Morris County Land Case. ... [Id. at 112, n. 4; emphasis supplied]
In resolving constitutional conflicts that court invited decision makers to be mindful of public environmental concerns and the impact which Morris Cty. Land would have in shifting to the public the burden to acquire and maintain vast, State-wide tracts of land. It becomes a sobering consideration, particularly when Morris Cty. Land postulates a test which is economic balancing, but limited in application to that tract.
More recently the pendulum in New Jersey has begun to swing away from readily compensating a landowner. Sands Point v. Sullivan, 136 N.J. Super. 436 (App.Div. 1975), concerned the designation of plaintiff's property as coastal wetlands, and consequential regulatory prohibition against draining, excavating or constructing without a permit. That court found such regulations had environmental importance to wildlife and mankind; since those regulations allowed plaintiff to seek a permit for the uses it desired, with judicial review, the regulations would not constitute a taking. Morris Cty. Land was distinguished.
In Schnack v. State, 160 N.J. Super. 343 (App.Div. 1978), certif. den. 78 N.J. 401 (1978), the State filed a highway alignment preservation map which was to run through plaintiff's residence. The State acquired all seven residences in the vicinity of plaintiff, leaving four commercial establishments. The State attempted to buy out Schnack but could not because plaintiff was unable to obtain alternate housing. Then the State suspended *325 the highway project. Plaintiff's expert testified that residential was now inappropriate: the highest use would be commercial or multi-family, and such zoning change was a reasonable probability. The property would have a $100,000 value but the filed map decreased value to a "distress" level of $40,000, and it would be unsaleable except for a severe local housing shortage. That court said that both Morris Cty. Land and Washington Market are distinguishable. Impairment to saleability should not be confused or equated with destruction of all reasonable or beneficial use; and if such an equation is possible, the reduction in marketability must closely approach zero before a taking occurs.[4]Schnack rationalized that the destruction of surrounding residences should result in a change of zoning use and permit commercial development. Ultimately the property would be worth many times over the price offered by the State. Meanwhile, Schnack could use the property for a residence or to generate rentals. Schnack had not been deprived of all reasonable use and her beneficial use had not been destroyed. Schnack v. State, supra, at 353.
The cautionary note of A.M.G. Associates v. Springfield Tp., supra at 112, n. 4 (1974), took definite form in some of our sister jurisdictions. The perceived need for regional planning beyond boundaries, cf. Southern Burlington Cty. NAACP v. Mt. Laurel Tp., 67 N.J. 151 (1975), cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975), and the increasing awareness of adverse ecological consequences from misuses of our resources, has created a new focus. In Candlestick Properties Inc. v. San Francisco *326 Bay Conserv. & Develop. Comm'n, 11 Cal. App.3d 557, 89 Cal. Rptr. 897 (D.Ct.App. 1970), plaintiff owned land, submerged at high tide by San Francisco Bay. It sought a permit to fill the land with demolition debris but defendant denied the application. Plaintiff sued, contending a taking had occurred because the land could have no value unless it was first filled. The court did not perceive the difference between police power and eminent domain as necessarily one of degree. Eminent domain was separately defined as an effective taking of private property for public use, requiring compensation; the exercise of police power was not a taking for public use but the regulation of or prohibition against use by private purposes, which is required for the public welfare. The equities of who should bear the financial loss resulting from governmental conduct was discarded as the controlling criterion; the purpose of the governmental act became the prime determinative. The court concluded that the present and future public need to control deleterious development and preserve the Bay until its future could be properly planned, justified the prohibition as a valid exercise of police power. Compensation was not required. The California court discussed Morris Cty. Land, supra, and distinguished it as merely providing open spaces rather than avoiding community harm.
Turner v. Del Norte Cty., 24 Cal. App.3d 311, 101 Cal. Rptr. 93 (D.Ct.App. 1972), concerned a flood plain ordinance, similar to the regulations here, in that residences and commercial uses were prohibited but recreational and agriculture uses were allowed. The court ruled that a compensable taking had not occurred since that ordinance imposed no restrictions more stringent than demanded by existing dangers to buildings or their occupants erected in the floodway, or to downstream buildings jeopardized by increased flood height through onsite construction. Essentially, the same ordinance regulated a flood plain in Turnpike Realty Co. v. Dedham, 362 Mass. 221, 284 N.E.2d 891 *327 (Sup.Jud.Ct. 1972), cert. den. 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 689 (1973), with the same result and for the same reasons. Turnpike Realty specifically considered that the value of the property depreciated from $431,000 to $53,000 because of the ordinance; while an 88% reduction was relevant, the court ruled it was by no means conclusive.
The evolving ecologically related concept was clearly stated in Just v. Marinette Cty., 56 Wis.2d 7, 201 N.W.2d 761 (Sup.Ct. 1972). An ordinance designed to regulate shoreline development was violated when plaintiff deposited fill without the required conditional use permit. That court wrote:
This case causes us to reexamine the concepts of public benefit in contrast to public harm and the scope of an owner's right to use his property. In the instant case we have a restriction on the use of a citizen's property, not to secure a benefit for the public, but to prevent a harm from the change in the natural character of citizens' property. We start with the premise that lakes and rivers in their natural state are unpolluted and the pollution which may exist is man made.... [201 N.W.2d at 767-768]
Is the ownership of a parcel of land so absolute that man can change its nature to suit any of his purposes? ... An owner of land has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others. The exercise of the police power in zoning must be reasonable and we think it is not an unreasonable exercise of that power to prevent harm to public rights by limiting the use of private property to the natural uses. [Id. at 768]
The Justs argue their property has been severely depreciated in value. But the depreciation of value is not based on the use of the land in its natural state but on what the land would be worth if it could be filled and used for the location of a dwelling. While loss of value is to be considered in determining whether a restriction is a constructive taking, value based upon changing the character of the land at the expense of harm to public right is not an essential factor or controlling. [Id. at 771]
*328 Research by this court discloses only one New Jersey case which has bottomed a part of its holding on the distinction underlying the environmental purpose of the governmental action. In American Dredging Co. v. State, 161 N.J. Super. 504 (Ch.Div. 1978), the DEP designated 80 of plaintiff's 2,500 acres as coastal wetlands thereby subjecting them to regulations prohibiting the depositing of dredged materials. Plaintiff contended a taking occurred because the land was devalued from $10,000 to $1,000 an acre, and had no other use except as a receptacle for fill. The court held that the thrust of the Wetland Act was to prevent harm to the public in stopping the despoilation of natural resources, not the enhancement of a governmental purpose. The regulation was held a proper exercise of police powers. The court also considered that only 3% of plaintiff's total lands were effected, and on a quantum basis ruled the regulation reasonable. When the case reached the Appellate Division, American Dredging Co. v. State, 169 N.J. Super. 18 (App.Div. 1969), that court did not treat with the trial court's primary holding. Whether the omission should be construed as a disapproval of the thesis, or simply not necessary for disposition of the case, is unclear. The Appellate Division simply considered the extent of the total property controlled by the property regulation and held that plaintiff failed to demonstrate that the regulation prevented all practical use of the entire property, particularly when open area will be required for any future industrial use of the tract.
The trend of courts in environmental settings to evaluate the purpose of the governmental act, is really not a novel approach. It is a particularization of the Brandeis position in Pennsylvania Coal Co. v. Mahon, supra, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); it is a rebirth of the old warhorse, Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887).
The ordinance in Morris Cty. Land v. Parsippany-Troy Hills, supra, 40 N.J. 539 (1963), contained restrictions similar in scope *329 to the DEP regulations at issue here. But Morris Cty. Land was premised on the principle that benefits were being conveyed to the public at large by generalized flood control to enhance unspecified far removed lands, and the preservation of wildlife in a refuge. Morris Cty. Land did not treat with that form of flood control which limits development posing personal or property destruction to those who might inhabit the very development or adjacent property. The circumstances reserved from decision in Morris Cty. Land v. Parsippany-Troy Hills Tp., supra, and to which allusion was made in A.M.G. Associates v. Springfield Tp., supra, 65 N.J. at 112, n. 4 is at hand for disposition.
We are continually being made aware that our vital natural resources, our whole ecology and the quality of human life, may no longer be considered limitless or indistructible. For the sake of future generations we are encouraged to become prudent stewards of present assets. No longer are we able to afford the luxury of squandering nature or indiscriminate over-development, without consequential regard, and masquerading as free and private enterprise. Perhaps it is trite, but nevertheless true: rights and responsibilities must go hand in hand. While all forms of development adversely affect the environment to the extent that they add to demands already being made, the right to use land should be carefully measured against the environment's capacity to tolerate such a use and the extent of harm which the proposed use would impose upon the established and proper use of neighboring lands.
I must conclude that with a proper balancing of ecology at stake, such as the flood control issue here, determining the purpose for the governmental act of restricting land development is critically significant in determining whether a compensable taking has occurred. If the purpose of the restriction was to prevent an abuse and the restrictions are reasonably related to that end, the act of restricting is a proper exercise of police power. Government must have the unfettered ability to protect *330 the general welfare of its citizens without subjecting them to bearing the cost. If this was not true then the greater the need for protection, with consequential public cost bearing, the less likely government would act to defend the rights of citizens who, in practicality, are unable to protect themselves. A private landowner has no right to misuse his own land to the severe detriment of another; how can he be heard to complain when a governmental entity acts to insure this result, even if development is strictured or he is required to maintain the natural state? On the other hand, if the purpose of the environmental restriction is to impart a public benefit, that is, to create a new enjoyment for citizens which, although not required, is nevertheless desirable, or to enhance the usefulness of other's lands, the suffering freeholder may very well have justifiable cause to complain. In this latter alternative the vitality of the Morris Cty. Land criteria is most appropriate. It then becomes a question of equitable economics, of whether the individual has been deprived of the reasonable use of his land to enrich another, of whether a fairly drawn line has been encroached, and for which compensation is due.
The analysis advanced in this opinion is not contrary to any New Jersey holding, however articulated. It conforms to environmental sensitivity, historic precedent and the recent approach taken by sister jurisdictions.
The purposes of the restriction at issue were verbalized by the DEP:
To minimize losses and damages to public and private property caused by land uses which, at times of flood, increase flood heights and/or velocities, to safeguard the public from danger and damages caused by materials being swept onto nearby or downstream lands, to protect and enhance the public's health by minimizing the degradation of stream water quality from point and non-point pollution sources, and to protect wildlife and fisheries by preserving and enhancing the environment of the flood plain.... [N.J.A.C. 7:13-1.1]
*331 The first three of these purposes are designed to avoid injuries which likely could arise from an improper land use or development during a likely flow of flood waters: injury to onsite property, injury to offsite persons or property in the downstream path of the debris from a wrongful development, and injury to community members who drink or use water contaminated by inappropriate onsite development. The other stated purposes appear beneficial in their aim. The promulgated regulations for the floodway here, prohibit structures to be occupied the storage of any materials and the depositing of any solid waste while generally allowing natural though unprofitable, uses. Plaintiffs seek compensation because the regulations bar them from constructing a proposed warehouse or any other industrial use. It seems clear that the DEP regulations are aimed to prevent injury during flooding to potential employees of the warehouse or materials which may be stored to other nearby citizens whose lives or property may be endangered by stored items being swept along in a flood and to all residents who might drink water polluted because the stored items have entered an aqueduct or aquifer. These restrictions are consistent with their stated purposes and are a reasonable means of attaining those goals. The subject regulations as applied to the facts of this case, have as their purpose the prevention of harm befalling other citizens. It is not unreasonable under these circumstances, to limit plaintiffs to the natural use of their own land. The act of the DEP must be deemed a proper exercise of a police power to prevent a misuse of nature, rather than an act of compensable taking.
Having reached this conclusion, the issue of determining the appropriate remedy for a limited taking becomes moot. However, for the sake of completeness should this determination be overturned, I would conclude that the appropriate remedy for this limited taking should be monetary damages rather than requiring the commencement of condemnation proceedings. The rationale for this conclusion and the formulation of such *332 damages is amply set forth in Washington Market Enterprises v. Trenton, supra, 68 N.J. at 123-124 (1975), and Lomarch Corp. v. Englewood, supra, 51 N.J. at 113-114 (1968). I would further find that any taking occurred on January 22, 1976 when plaintiffs actually first sought to develop property. I am not satisfied that a taking took place on May 21, 1973 when the land was officially designated a floodway, or on December 13, 1974 when the DEP informed plaintiffs of the designation and invited submission of construction plans which were never submitted, or on June 2, 1975 when the DEP promulgated the regulations. The reason for my rejections of those dates is that I am unsatisfied plaintiffs were then ready or able to develop and therefore were not proximately harmed by any of those governmental acts. The appropriate date commencing entitlement to any damages would be January 22, 1976 when plaintiffs applied to build. June 2, 1979, when the floodway designation was abandoned, is the appropriate date for termination of damages. Plaintiffs do not contend that any depression of full present value has occurred because of the DEP's designation and subsequent abandonment. Consideration of a time lag for market rebound is therefore inappropriate, under the proofs before me.
In choosing between the valuations of the experts, I am more persuaded by the conclusions of the expert offered for the State because he used more appropriate comparative sales, because he gave recognition to an appreciaion in property value over the period, and because he properly took a credit for the residual value of the property. However, he improperly apportioned paid taxes. I would therefore conclude that if a limited taking occurred, the period includes January 22, 1976 to June 2, 1979; the proper damages would be $42,301.96, plus interest from June 2, 1979.
NOTES
[1] The residual value was not utilized by plaintiffs in computing damages because it was too minimal.
[2] Plaintiffs used 10.5% as annual rental value for the period 12/13/74 to 6/1/75 because of its short span.
[3] Taxes paid for the residual value were not credited by plaintiffs in calculating damages.
[4] Schnack chose to overlook the actual result of Washington Market, which allowed limited taking damages rather than requiring condemnation because the property had value worth developing. "A private person is generally better able to develop and exploit a piece of real estate than is a municipality and as a matter of policy it is undesirable to remove ratables from the tax rolls." Washington Market Enterprises v. Trenton, 68 N.J. 107, 123 (1975).