688 A.2d 662

JOSEPH B. PARUSZEWSKI, PLAINTIFF–APPELLANT, v. TOWNSHIP OF ELSINBORO, TOWNSHIP COMMITTEE OF TOWNSHIP OF ELSINBORO AND THE ZONING BOARD OF ADJUSTMENT FOR THE TOWNSHIP OF ELSINBORO, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 7, 1997—Decided February 20, 1997.

Before MICHELS and COBURN, JJ.

*Patrick F. McAndrew* argued the cause for appellant.

*John G. Hoffman* argued the cause for respondent.

The opinion of the court was delivered by

COBURN, J.S.C. (temporarily assigned).

This is an appeal from a judgment of the Superior Court, Law Division, affirming a decision of the Zoning Board of Adjustment for the Township of Elsinboro. Plaintiff applied to the zoning board pursuant to *N.J.S.A.* 40:55D–68 for "certification that the use" of a field on his family's farm as an airstrip "existed before the adoption of the ordinance which rendered the use . . . nonconforming." *Ibid.* After a plenary hearing, the zoning board refused to issue the certificate. Plaintiff filed an action in lieu of preroga-

tive writs in the Law Division, lost there, and now appeals to this court. He contends the decision of the zoning board should have been reversed by the trial court for two reasons: (1) the governing body of the Township of Elsinboro, through its attorney, appeared before the zoning board in opposition to the application; and (2) the zoning board's decision was arbitrary, capricious, and unreasonable. We disagree with plaintiff's contentions and affirm the judgment.

## I

The Township of Elsinboro's first land use ordinance, adopted in 1966, did not address the subject of airstrips directly or indirectly. Section 601 of the 1968 land use ordinance permits in plaintiff's zone "[c]ustomary and conventional farming operations...." Section 1101 of this ordinance prohibits in each zone all uses not expressly permitted, thereby indirectly prohibiting airstrips in plaintiff's zone. It further provides, "the lawful use of land ... existing at the date of the adoption of this Ordinance may be continued, although such use ... does not conform to the regulations specified by this Ordinance for the zone in which such land ... is located," provided that "no non-conforming use may be expanded."

According to the testimony, in 1979, the governing body adopted an ordinance which permitted as a conditional use in plaintiff's agricultural zone a "basic utility airport." The concept was not otherwise defined.

On January 1, 1992, the governing body adopted Ordinance 82–1 declaring that "basic utility airports be eliminated as a conditional use...."

According to plaintiff's testimony before the zoning board, his family's farm contains 135 acres. On the farm's southern boundary, abutting Walnut Street, is an unimproved field which plaintiff said was a utility airport or airstrip used by himself, his family, and friends since somewhere between 1958 and 1962. On rare occasions, helicopters used the field. On all other occasions, the

craft were small, single engine, fixed wing airplanes. Plaintiff wanted to use the field for airplanes about five to twenty times per year. He claimed that had been its annual use. In 1989, the Township's zoning officer directed no further use of the field as an airstrip.

Plaintiff was forty-eight years old at the time of the zoning board hearing. His family had owned the farm since 1950. He said he got his pilot's license around 1966. He did not land any planes on the field from 1958 to 1962. The first plane in which he had an ownership interest was acquired sometime after 1974. It was not kept at the farm. He was in the military from 1966 through 1969, and during that time he would visit the farm six or seven times a year. Later he changed that to two or three times a year after it was brought out that he had been stationed in California, Nevada, Louisiana, and Texas, but then he reasserted that the visits happened about six times per year. When asked how he arrived at the figure of five to twenty times per year for use of the field as an airstrip, he said: "I could legally say it was more than one and less than a thousand. I know it was more than one and less than a thousand." He admitted that he had not seen someone land there at least once in every year. He was asked, "So, there has been at least a five year period when no airplanes landed there?" He replied, "Yeah, but not constant." He was then asked, "So, at least once every 10 years, you personally observed an airplane land?" He replied, "I would say that." He also indicated the field was rented to other farmers who raised corn and other crops there and that planes would land on the crops without damaging them. He could not recall whether a helicopter landed there from 1970 to 1992. He also indicated that planes landed on various parts of the farm over the years, though he claimed they mostly landed on the field in question.

The next witness called by plaintiff, a Mr. Bacon, testified that he saw planes land on the site no more than three or six times from 1971 to 1989.

Plaintiff's father, Ray Paruszewski, testified that friends started landing planes on the field in the early 1960's. He said that sometime there would be landings 3 or 4 times a month and sometimes a month would go by with no landings. He said there was some usage every year until 1989. In answer to a leading question, he agreed with his son's estimate of five to twenty landings per year, but also said he did not recall exactly. He said his other son, Jeff, used the field for landings from 1968 (when the family purchased a plane which was kept at Salem Airport) until 1974. He also said the field in question had been used for growing crops every year since 1951. No one in the family owned a plane before 1968.

A number of witnesses testified in opposition to the application. One indicated that he lived across the street from the farm and was home and outside most of the time. In the preceding thirty-eight years, he had only seen four planes and one helicopter use the field. Another witness, an abutting neighbor since 1974, said she saw no planes and her husband saw one. The last opponent said she had lived within about 400 feet of the field for twenty-seven years until she moved away in 1987 or 1988. During that time, the field was used by planes only once or twice, the last use occurring more than five years before she left.

The zoning board adopted Resolution No. 94–11–01 which re-counted at length the testimony of the various witnesses and then concluded that the application should be denied for the following reasons:

> [I]t is clear that there has been aircraft activity at the Paruszewski farm which activity pre-dates the original Township Zoning Ordinance which was adopted on February 27, 1968. While the applicant testified that this activity was fairly frequent, between 5 and 20 times per year, much of his testimony was contradicted by neighbors and his father. In addition, the Board concludes that much of the testimony of the applicant is not credible. * * * Although all of the other witnesses testified that there was aircraft activity on the Paruszewski farm, the credible testimony is that it began in approximately 1960 and was very sporadic. * * * The neighbors, some of whom lived across from the ... farm for 30 years, testified that the number of take-offs and landings were (sic) very low and characterized them as unusual events which attracted their attention. * * * [T]his activity did not rise to the level of a principal or accessory use for the property.

* * * [T]he sporadic, occasional landing of aircraft on the ... field would not customarily be incidental to the principal use of the property nor is it so necessar[ily] or customar[ily] associated with the principal use to be expected that the Township Zoning Ordinance could not have been expected to prohibit it. * * * [T]he aircraft activity which occurred ... prior to the adoption of Ordinance No. 68–1 [the 1968 Ordinance] does not attain the level of a principal or accessory use subject to protection pursuant to *N.J.S.A.* 40:55–68 and Section 3.6 of the Township Land Development Ordinance.

## II

The party asserting the existence of a nonconforming use prior to the adoption of the relevant zoning ordinance has the burden of proof. *N.J.S.A.* 40:55D–68; *Weber v. Pieretti,* 72 *N.J.Super.* 184, 195, 178 *A.*2d 92 (Ch.Div.), *aff'd,* 77 *N.J.Super.* 423, 186 *A.*2d 702 (App.Div.1962), *certif. denied,* 39 *N.J.* 236, 188 *A.*2d 177 (1963). When the zoning board rejects an application to certify a use as nonconforming that decision is entitled to judicial support if it is based upon substantial evidence. *Kramer v. Board of Adj., Sea Girt,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965).

The governing section of the Municipal Land Use Law, *N.J.S.A.* 40:55D–68, employs without definition the critical phrase "nonconforming use." To define this concept, we must refer to the case law and other authority.

Here the principal use of the plaintiff's property was for a farm and residence. He contends use of the field as an airstrip was an accessory use. An airstrip can be an accessory use to a farm and residence. *Schantz v. Rachlin,* 101 *N.J.Super.* 334, 336–42, 244 *A.*2d 328 (Ch.Div.1968), *aff'd o.b.,* 104 *N.J.Super.* 154, 249 *A.*2d 18 (App.Div.1969). However, such use can also be barred by local ordinance, *Id.* at 342, 244 *A.*2d 328, as it was in this case from 1968 to 1979, and after January 1, 1992.

The critical question is whether the law requires a certain level of activity for a nonconforming activity to be considered a "use." Clearly, a mere intention to use the property is not enough to establish use. *Morris County Land, etc. v. Parsippany–Troy Hills Tp.,* 40 *N.J.* 539, 550, 193 *A.*2d 232 (1963). " ' * * *[I]t is an

existing *use occupying* the land, that the statute protects; the statute does not deal in mere intentions.'" *Ibid.* (citing *Martin v. Cestone,* 33 *N.J.Super.* 267, 269, 110 *A.*2d 54 (App.Div.1954)).

In *State v. Gargiulo,* 103 *N.J.Super.* 140, 246 *A.*2d 738 (App.Div. 1968), the court said:

> While business signs may attain the status of nonconforming uses, the temporary use of a sign or banner, if and when the advertising policy of a manufacturer of a product calls for it, does not amount to a nonconforming use.... The situation here involved is to be distinguished from that found in *Civic Association of Dearborn Township, Dist. No. 3 v. Horowitz,* 318 *Mich.* 333, 28 *N.W.2d* 97 (1947), cited by defendant, where it was held that operation of a carnival, which was closed down for the winter when an ordinance prohibiting such use was enacted, constituted a nonconforming use which could be continued. There, as in *Burmore Co. v. Smith,* 124 *N.J.L.* 541 [12 *A.*2d 353] (E. & A. 1940), the court was dealing with a use which was necessarily seasonal in its nature, as distinguished from use of the subject premises on an all-year-round basis. Here, the display of the sign was not necessarily seasonal, but depended upon whether and when it was called for by Tidewater's current advertising program. * * * An accessory use may not be permitted to depend upon the whim or ingenuity of those engaged in sales promotion. It requires considerably more substance....
>
> [*Id.* at 146–48, 246 *A.*2d 738.]

In Cox, *New Jersey Zoning and Land Use Administration,* § 11–1.2 at 191 (1995) the following comment on *State v. Gargiulo, supra,* appears:

> From *Gargiulo* it is evident that the use to be protected must be of a continuing rather than of an ephemeral nature.

In *State v. Loux,* 76 *N.J.Super.* 409, 413, 184 *A.*2d 755 (App.Div. 1962), the court, in sustaining a conviction for violation of the local zoning ordinance, noted that it was rejecting defendant's contention that his activity constituted maintenance of a nonconforming use in part because "[t]he testimony adduced by defendant as to the use of the lots was imprecise and nebulous." The court went on to observe:

> There is no convincing proof as to exactly on which of these lots boats may have been placed, when they were stored, and by whom they were put there. If boats were stored, the users were at best trespassers, the use intermittent, and the time of such use indefinite. A nonconforming use may not be erected on so insubstantial a foundation.
>
> [*Ibid.*]

We do not perceive *State v. Loux, supra,* as turning on its reference to the users as trespassers, even though that fact may have provided additional support for the court's conclusion. Rather, we perceive its central holding to be that a nonconforming use may not be established by nebulous and imprecise evidence which indicates at most intermittent use at indefinite times. To put the matter more generally, "for rights in a previously existing use to be protected under the doctrine of vested nonconforming uses" one of the factors which must be proven is that the use "be sufficiently substantial to warrant invocation of constitutional protection." 4 Rathkopf, *The Law of Zoning and Planning,* § 51.01 at 51–9 (4th ed.1994).

Plaintiff's evidence wholly fails to meet the principles of law stated above. The zoning board was entitled to reject his testimony as incredible, as it did. His father's testimony was equally imprecise if not equally disingenuous. The evidence from the opponents was clear and strong. The zoning board was entitled to credit it and draw the obvious conclusion that a plane landing or taking-off from this field was an extremely rare and remarkable event and that the actual use was at best ephemeral, intermittent, and indefinite. Since the zoning board's findings were based on substantial evidence, the trial court was correct in upholding them, and we are bound to do likewise. *Kramer v. Board of Adj., Sea Girt, supra.*

### III

■ Plaintiff contends that the entire proceeding before the zoning board was marred because of the presence of the Township Attorney appearing in opposition to the application on behalf of the governing body. This, in his view, requires a reversal and grant of the nonconforming use by this court. We disagree.

Before discussing the law, some additional facts should be noted. On September 6, 1994, the governing body adopted a resolution to consider in closed session what its position should be

with respect to plaintiff's pending zoning board application. The minutes of that meeting recite the following:

> It was represented that the purpose of the meeting was to determine what position the Township should take in connection with an application filed on behalf of Joseph B. Paruszewski by Patrick McAndrew, Esquire with the Board of Adjustment requesting that it determine if an airstrip may be constructed and utilized upon his property as a non-conforming use.
>
> \* \* \* \* \* \* \* \*
>
> It was determined that the Township Solicitor as well as the Zoning Officer should appear at the Board of Adjustment meeting and present evidence establishing that the use is not non-conforming and/or was abandoned. Said position was taken by the Township based upon the Planner's opinion that operating an airport at said vicinity would be detrimental to the Master Plan and zoning scheme.

At the zoning board hearings, the Township attorney said he was appearing on behalf of the governing body and on behalf of those citizens who opposed the plaintiff's application (there was no indication that he had actually been retained by the citizens, and his comment about representing them was probably not intended to convey the idea that he was actually their lawyer, other than indirectly based on his representation of the governing body). In any case, he cross-examined the plaintiff and his witnesses, conducted the direct examination of the opposing witnesses, and submitted oral and written argument on behalf of the governing body against grant of the plaintiff's application.

We begin our analysis by noting that an application for a certification of a nonconforming use is entirely within the jurisdiction of the zoning board under *N.J.S.A.* 40:55D–68. There is no appeal to the governing body. Anyone dissatisfied with the result must seek relief by way of an action in lieu of prerogative writs in the Law Division. *Cronin v. Township Committee,* 239 *N.J.Super.* 611, 618, 571 *A.*2d 1354 (App.Div.1990). Consequently, this case does not raise the kind of conflict of interest problems dealt with in *South Brunswick Assoc. v. Township Council,* 285 *N.J.Super.* 377, 667 *A.*2d 1 (1994), where the court held that a council member who appeared in opposition to an application before the zoning board could not thereafter vote on the matter on appeal to the governing body. Nor are we concerned here with an action

between a zoning board and a planning board, such as occurred in *Washington Tp. Zon. Board v. Planning Board,* 217 *N.J.Super.* 215, 525 *A.*2d 331 (App.Div.), *certif. denied,* 108 *N.J.* 218, 528 *A.*2d 36 (1987), where we held that "the planning board's exercise of its *quasi* judicial power, whether right or wrong, to treat the application as a hardship variance, should be immune from an action at law instituted by the zoning board." *Id.* at 223, 525 *A.*2d 331. We further explained:

> We have no doubt that there are many instances when a zoning board perceives an application before the planning board as being a special reasons, rather than a hardship variance. If a zoning board is permitted to institute a suit in every such instance, the prompt and orderly review of land use applications, envisioned by the act, would essentially grind to a halt. Suits by co-equal agencies simply to vindicate their respective statutory powers will unfairly victimize the developers, particularly when no 'interested party' has seen fit to challenge the application. Public funds, of course, will be drawn upon to pay the legal fees of both contestants, even though the public's interest will not necessarily be served by the litigation.
>
> [*Id.* at 223–24, 525 *A.*2d 331.]

The governing body of a town is not a co-equal agency with the zoning board. Charged with the responsibility of protecting the public interests of all citizens, its responsibilities are grave and broad. Thus in *Zoning Board of Adj. of Green Brook Tp. v. Datchko,* 142 *N.J.Super.* 501, 362 *A.*2d 55 (App.Div.1976), the court recognized the right of the governing body (as well as the zoning board) to maintain an action against the owner of an "adult" bookstore to rescind the grant of zoning variances and site plan approval granted to the bookstore:

> Moreover, as to the township plaintiff, it may be considered a prerogative writ action to review the actions of the zoning board, planning board and the zoning officer alleged to be in violation of their authority.
>
> [*Id.* at 508 n. 2, 362 *A.*2d 55.]

The court also said:

> The township ... and the zoning board have a substantial public interest in preserving the integrity of the zoning ordinance. If, as here, a municipal authority has been induced to grant relief in connection therewith by fraud, it need not stand idly by. It or the municipal governing body may institute an action, such as that in the present case, to rescind the relief so granted and to enjoin what is actually a violation of the zoning ordinance and plan. From defendants' own application to the municipal authorities it is apparent that the present use of the premises would

not have been feasible without the approvals of the site plan and the variances. Their misrepresentations denied the municipal agencies of an opportunity to review all of the facts before determining the propriety of the site plan approval, the grant of the variances or the issuance of the certificate of occupancy in the light of proper zoning considerations. Judicial relief by this action is available to these plaintiffs to rectify what may reasonably be considered a substantial impairment of the zoning plan.

[*Id.* at 508–09, 362 *A.*2d 55 (citations omitted).]

In *Township of Dover v. Board of Adj. of Tp. of Dover,* 158 *N.J.Super.* 401, 386 *A.*2d 421 (App.Div.1978), another panel of this court analyzed the relationship between a governing body and the zoning board in somewhat different terms:

[T]he board of adjustment is an independent administrative agency whose powers stem directly from the Legislature and hence are not subject to abridgement, circumscription, extension or other modification by the governing body. We also agree that a necessary corollary of that principle is that ordinarily the manner in which the board exercises its exclusive statutory power is not subject to monitoring by the governing body and is therefore immune not only to direct interference by the governing body but also to the indirect interference of an action in lieu of prerogative writs brought by the governing body seeking judicial review of the board's determinations. Our point of disagreement turns on the fact that what the township is here complaining of is not the manner in which the board exercised its statutory power. Its claim, rather, is that the board exceeded its statutory powers and in so doing usurped the function exclusively reserved to the governing body by the enabling legislation. Thus, this is not the ordinary variance case in which the board of adjustment's action may be vulnerable for such alleged misuses of discretion or power, as, for example, an action taken unwisely or imprudently, or without an adequate factual basis in the evidence before it, or without an adequate statement of reasons or contrary to the governing body's collective perception of what the public good may permit or what the integrity of the zoning ordinance may require. In our judgment, review at the instance of the governing body of such alleged errors in the exercise of statutory authority and such disputes as to the exercise of discretion would seriously and perhaps irremediably undermine the board's essential autonomy. We are therefore satisfied that so long as the board acts within the ambit of its authority, whether it has acted wisely or not, and whether it has acted correctly or not, are not matters which the governing body itself should be able to raise.

An arrogation of authority is, however, quite a different matter and, in our view, is necessarily and obviously actionable by the body whose authority has been directly infringed upon.

[*Id.* at 408–09, 386 *A.*2d 421 (citations omitted).]

Some of what we have just quoted from the *Dover* case would appear to conflict with footnote 2 of *Green Brook, supra.* However, we need not address that apparent conflict in this case since we

are not presented with a governing body attempting to overturn a decision of the zoning board. To the contrary, the governing body is supporting the zoning board's decision, and is doing so, not as the instigator of the litigation, but, rather, as a defendant. Furthermore, the *Dover* case does not prohibit a governing body from having its attorney appear in opposition to a citizen's application for relief. Indeed, since *Dover* recognizes the governing body's right to sue the zoning board in some circumstances, implicit in that decision is the governing body's additional right to make an appropriate record before the zoning board.

Turning for a moment to the status of the law on the point in question in other jurisdictions, we note the following:

> The municipality in which the subject property is situated has been held to have the right to question and seek review of the land use decisions of its administrative officers or its quasi-judicial bodies such as the board of adjustment or planning board. So, the municipality, as such, may appeal to the local board of appeals from the issuance of a building permit by its building inspector or may appear in opposition to an appeal to the board by one who has been denied a permit or who seeks a variance or a special permit.

> Similarly, in those states in which the zoning enabling act is patterned after the Standard State Zoning Enabling Act, a municipality is considered to have standing to seek judicial review of any decision of the board of adjustment as a matter of law. However, the courts have not been in full accord on this point. In most, a municipality is a proper party to appeal from the decision of the local board of adjustment because the enabling act provides for such an appeal. In these, there is no necessity for the municipality to plead or prove "aggrievement," the statute distinguishing between aggrieved persons and "any officer, department, board or bureau of the municipality."

> In others, in the absence of some demonstration of a personal or pecuniary interest which would qualify it as an aggrieved party within the statute providing for review, it is held that the municipality has no standing to complain of the action of the board of appeals.

> In some states, it is held that aggrievement in a public sense occurs whenever the action of the board of appeals appears to threaten the preservation and integrity of the zoning plan. . . .

> [3 Rathkopf, *The Law of Zoning and Planning*, § 43.05 at 43–32 to—34 (4th ed.1994) (footnotes omitted).]

With respect to this standing issue, which relates in New Jersey to what the Municipal Land Use Law describes in *N.J.S.A.* 40:55D–4 as an "interested party," the *Dover* court observed:

> We are aware ... that in other jurisdictions standing has been conferred by statute upon various municipal agencies and officers who appeal to the courts from decisions of boards of adjustment. We do not, however, regard the absence of statutory standing in this jurisdiction as indicating a legislative determination to withhold from a governing body the right to sue to protect the integrity of its own legislatively conferred powers. This jurisdiction, moreover, has historically taken a liberal approach to the standing question in land use planning as well as in other actions particularly where matters of public policy are at stake.

> [158 *N.J.Super.* at 410–11 n. 2, 386 *A.*2d 421.]

With the principles of *Green Brook, supra,* and *Dover, supra,* in mind, we have no doubt that the governing body in this case was wholly within its rights in appearing before the zoning board to lay before that body its views with respect to the merits of plaintiff's application. Had the governing body been unsuccessful before the board and thereafter wished to test the board's decision by an action in lieu of prerogative writs, we would have had to consider whether *Green Brook,* with its endorsement of a broad right to sue, or *Dover,* with its more limited recognition of a governing body's right to sue its zoning board, is correct. But we need not address that issue to decide this case. Here, as noted, the governing body was brought into court as a defendant. It only wished to be heard in support of the zoning board's decision. We see no reason for denying the governing body the right to speak out in the public interest in such circumstances.

Affirmed.