693 A.2d 114

EAST CAPE MAY ASSOCIATES, A FLORIDA LIMITED PARTNER-
SHIP, PLAINTIFF–RESPONDENT, v. STATE OF NEW JERSEY,
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PRO-
TECTION, AND ROBERT C. SHINN, JR., IN HIS OFFICIAL
CAPACITY AS COMMISSIONER OF THE NEW JERSEY DE-
PARTMENT OF ENVIRONMENTAL PROTECTION, DEFEN-
DANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued November 12, 1996—Decided April 29, 1997.

326

Before Judges HAVEY, BROCHIN and EICHEN.

*Rachel Horowitz,* Deputy Attorney General, argued the cause for appellants (*Peter Verniero,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Ms. Horowitz,* on the brief).

*Jack Plackter* argued the cause for respondent (*Horn, Goldberg, Gorny, Daniels, Plackter* and *Weiss,* attorneys; *David A. Sacks,* on the brief).

*Edward Lloyd* argued the cause for amici curiae, New Jersey Conservation Foundation, American Littoral Society, and National Audubon Society (*Rutgers Environmental Law Clinic,* attorneys; *Mr. Lloyd,* on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

Plaintiff East Cape May Associates, a limited partnership, owns approximately 100 acres of undeveloped land in the City of Cape May, New Jersey. Most of the property is freshwater wetlands, and both the State and East Cape May agree that it is of "exceptional resource value," a statutory designation which subjects the property to heightened protection against development.

*N.J.S.A.* 13:9B–7, –10c; *see Rossi v. Division of Coastal Resources,* 92 *N.J.A.R.*2d (Vol.5) 244 (Dep't of Envtl. Prot. & Energy). An application by East Cape May to develop the property for residential use has been denied. East Cape May does not dispute that the denial is consistent with the applicable statutes and regulations, and that they serve a legitimate state interest. *See Dolan v. City of Tigard,* 512 *U.S.* 374, 385–87, 114 *S.Ct.* 2309, 2317, 129 *L.Ed.*2d 304, 317 (1994) (property may be taken for public use only when an essential nexus exists between a legitimate state interest and the taking). It asserts, however, that its property has been the subject of a regulatory taking by the State of New Jersey acting through the Department of Environmental Protection. It therefore seeks to have the property formally condemned and to be paid fair compensation.

The 100–acre property which is the subject of East Cape May's claim for inverse condemnation is located on the east side of Pittsburgh Avenue, a county road. There is a parcel of approximately equal size on the west side of Pittsburgh Avenue. East Cape May's principals, Phillip Robinson and Thomas Brodesser, Jr., assert that, acting in their own names or through another partnership, they own or owned that other parcel and have constructed a substantial number of residential housing units on it. They allege that they always contemplated developing both parcels, but that planning and construction proceeded in stages because of the size of the property.

The first specific plans for the land on the eastern side of Pittsburgh Avenue appear to have been made in 1986. In December 1988, Robinson and Brodesser filed a CAFRA (Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 *et seq.*) application to construct ninety-six multi-family homes on a portion of the eastern parcel. On July 23, 1990, Robinson and Brodesser filed a new CAFRA application to build 366 single-family homes on that tract. In the course of a preliminary analysis of the new application, the DEP requested substantial information in addition to what had previously been submitted. The applicants declined to furnish the

missing information because, they explained, providing the additional information would have been costly, and applicable regulations, including regulations relating to wetlands and wetlands buffers, would have prohibited development no matter what additional materials were supplied. They asked the DEP to waive some of the pertinent regulations, but the DEP refused and denied their application in an opinion of the DEP's Director of the Division of Coastal Resources.

The applicants appealed to the Commissioner of the Department of Environmental Protection, and the matter was transferred to the Office of Administrative Law. *N.J.S.A.* 13:9B–20. Prior to any hearing, the applicants stipulated that they had "no facts or law which dispute[ ] the findings and conclusions" set forth in the Director's opinion. They withdrew their request for a hearing, and all parties consented to having the case returned to the DEP for final disposition. The Director's decision denying the development application became final. His findings, which have not been appealed and which are undisputed, therefore establish the facts of the case.

The Director's opinion describes the property as a "tract ... approximately 100 +/− acres in size and consist[ing] of wooded areas, forested freshwater wetlands, emergent wetlands, mosquito ditches and some small upland areas." Applying the criteria set forth in *N.J.A.C.* 7:7E–5.1 to –5.7, he determined that the site has a "Low Acceptable Development Intensity rating, which allows a maximum impervious site coverage limit of 3—5%." The Director's opinion also found that "[f]reshwater wetlands have been identified on.... at least 90% of the site.... [as] shown on a map ... prepared by the Army Corps of Engineers and submitted to the Division ... by the applicants ... [which] appears to be an accurate representation of the extensive wetlands on the project site." In addition, the Director determined that "the wetlands on the subject property are habitat for several threatened and/or endangered species. Therefore, the buffer required from the wetlands would be a minimum of 150 feet. This buffer, in most

cases, encompasses the upland portions on the site." Finally, according to the Director's opinion, "The proposed project site contains Endangered and Threatened Species habitat and Critical Wildlife Habitat." Because "the proposed project would adversely affect this habitat, the proposed development is prohibited" by the regulations protecting endangered and threatened species and critical wildlife habitats.

Because the subject property is classified as "Low Acceptable Development Intensity," not more than five percent of the land area can be used for buildings, roads, and sidewalks. *N.J.A.C.* 7:7E–5.6(d). The Director's finding that "freshwater wetlands" comprise more than ninety percent of the site means that a permit to develop that ninety percent of the property can be issued only if there is no "practicable alternative to the proposed activity." *N.J.A.C.* 7:7A–3.1. For nonwater-dependent activities, a category that includes any use of the subject property because it does not abut on any body of water, there is a rebuttable presumption that there is some practicable alternative to the proposed regulated activity that would have less of an impact on the aquatic ecosystem. *N.J.A.C.* 7:7A–3.3(b). To rebut this presumption, the applicant must demonstrate, among other things, "[t]hat the basic project purpose cannot reasonably be accomplished utilizing one or more other sites in the general region that would avoid, or reduce, the adverse impact on an aquatic ecosystem...." *N.J.A.C.* 7:7A–3.3(d)(1). An alternative will not be excluded from consideration merely because it includes or requires an area not owned by the applicant which could reasonably be obtained or utilized in order to fulfill the basic purpose of the proposed activity. *N.J.A.C.* 7:7A–3.3(c)(2). *See N.J.S.A.* 13:9B–10a. *Cf. Stone v. Division of Coastal Resources,* 92 *N.J.A.R.*2d (EPE) 148, 1992 *WL* 277360 (Dep't of Envtl. Prot. & Energy 1992) (individual who purchased property to build single-family home must look to alternative wetland sites for building); *Martin v. Department of Environmental Protection,* 1991 *WL* 313688 (N.J. Dep't of Envtl. Prot. & Energy June 24, 1991); *Rodman v. Department of Envtl. Protection,* 1991 *WL* 313689 (N.J. Dep't of Envtl. Prot. & Energy

Feb. 5, 1991); *In re Freshwater Wetlands Permit Application, No. 1512–890884.11P,* 1991 *WL* 313693 (N.J. Dep't of Envtl. Prot. & Energy July 15, 1991), all upholding the denial of permits for construction on freshwater wetlands because other, non-owned land could have been acquired to be used as the sites for the projects.

Furthermore, *N.J.A.C.* 7:7A–3.5 provides that a permit can be issued for development of freshwater wetlands only if the development

1. Will result in a minimum feasible alteration or impairment of the aquatic ecosystem including existing contour, vegetation, fish and wildlife resources, and aquatic circulation of the freshwater wetland and hydrologic patterns of the watershed;

2. Will not jeopardize present or documented habitat or the continued existence of a local population of a threatened or endangered species listed pursuant to "The Endangered and Nongame Species Conservation Act"....

11. Is in the public interest, as determined by the Department in consideration of the following:

...

vii. The ecological value of the freshwater wetlands and probable individual and cumulative impacts of the project on public health and fish and wildlife....

*See N.J.S.A.* 13:9B–9b.

Because the subject property is the habitat of endangered or threatened species, development is "prohibited unless it can be demonstrated that endangered or threatened wildlife or vegetation species habitat would not directly or through secondary impacts on the relevant site or in the surrounding area be adversely affected." *N.J.A.C.* 7:7E–3.38(b). In addition, development on the site that would "adversely affect critical wildlife habitats is discouraged, unless ... [t]here is no prudent or feasible alternative location for the development...." *N.J.A.C.* 7:7E–3.39(b). "Discouraged" is a defined term; it means that

a proposed use of coastal resources is likely to be rejected or denied as the Department has determined that such uses of coastal resources should be deterred and developers should be dissuaded from proposing such uses.

[*N.J.A.C.* 7:7E–1.5.]

Prior to the Director's issuance of his formal opinion denying a development permit, the DEP provided informal advice and pre-

liminary opinions to the would-be developers. Accurately reflecting the purport of the pertinent regulations, the substance of the advice was that no economically viable development of the property would be feasible. Mark Mauriello, the DEP's supervisor for the Cape May Region, informed Robinson and Brodesser in a June 26, 1990 letter that the proposed 366-unit development:

> As proposed, ... is not in compliance with the Rules on Coastal Resources and Development. The primary reasons for this are the extent of wetlands on the project site and the presence of threatened and/or endangered species. Therefore, as proposed, the project is not likely to be approved by the Department. *Furthermore, because the on-site wetland areas are so extensive, it appears that even a more scaled back project would result in disturbance of these Special Areas, which is prohibited by the Division.*

> [Emphasis added.]

Shortly after the issuance of the Department's January 1991 formal opinion denying a development permit, Mauriello wrote to clarify the references in the opinion to missing information. He stated that the proposed project did not comply with the DEP's regulations primarily because of the presence of extensive freshwater wetlands and of endangered species habitat. Consequently, according to Mauriello, the DEP concurred with the applicants' view that "submission of all the requested information would not alter the prohibited status of the application, and would constitute a waste of time and money."

In an affidavit which the State submitted in opposition to East Cape May's motion for summary judgment, which is the subject of the present appeal, Mauriello sought to explain his June 26, 1990 letter. His affidavit states:

> 4. Because of the fragile and sensitive ecological nature of the project site, the letter indicated that the proposed 366 residential unit project would be strongly discouraged by the Division policies and the permit for that specific proposed project would most likely be denied. In addition, because of the extensive on-site wetlands, I noted that even a scaled back project of that design would result in disturbance to Special Areas, which is prohibited by the Division.
>
> ...
>
> 6. ... My experience convinces me that the potential for approvable development on the site exists. However, due to the extensive sensitive areas limiting development, I believe it would be difficult though not impossible for the applicant to fashion an application which could be approved.

The State has not yet suggested, even in the briefs to our court, what development of the property would be permissible.

At some point, probably after the dismissal of Robinson and Brodesser's appeal from the denial of their application for a development permit, the subject property was conveyed to East Cape May Associates, which filed this action for inverse condemnation. The actual date of the transfer is unclear. The State contends that it first heard of East Cape May in December 1992, when the complaint was filed. The amended complaint alleges that:

> Provisions of the New Jersey Freshwater Wetlands Protection Act, *N.J.S.A.* 13:9B–1, *et seq.,* the New Jersey Wetlands Act, *N.J.S.A.* 13:9A–1, *et seq.,* and the Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1, *et seq.,* the Endangered and Nongame Species Conservation Act, *N.J.S.A.* 23:2A–1, *et seq.,* insofar as they established permit requirements for the development of wetland properties, prevent the development of [East Cape May's] Property, rendering the Property devoid of any beneficial use to the plaintiff. . . .

In a motion for summary judgment, East Cape May contended that these statutes and the regulations issued to implement them, as applied to its property by the denial of its application for a development permit, had effected a regulatory taking of its property in violation of its rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 20 of the New Jersey Constitution. (The protections against the uncompensated taking of private property for public use which are afforded under each of the constitutions are coextensive. *Littman v. Gimello,* 115 *N.J.* 154, 161, 557 *A.*2d 314, *cert. denied,* 493 *U.S.* 934, 110 *S.Ct.* 324, 107 *L.Ed.*2d 314 (1989).)

The State argued that summary judgment should be denied because East Cape May had failed to exhaust its administrative remedies. The court rejected that argument. It held that no further exhaustion of administrative remedies was required because "[o]n the evidence submitted to the Court, there are no grounds to conclude that any development will be allowed." The motion judge explained in his opinion denying the State's motion for reconsideration:

[T]he plaintiff submitted a migratory bird survey and habitat evaluation which found that the site is home to numerous federal and state endangered species; a wetlands delineation map which found that the property is more than 90% wetlands with three uplands areas which are not buildable because the area is habitat for threatened and endangered species; a letter from the United States Department of the Interior, Fish and Wildlife Service which stated that the property has been added to its "priority wetlands" list and will be considered for acquisition. In addition, the plaintiff has been denied waivers from the Wetlands and Endangered Species rules of the Rules on Coastal Zone Management.

Alternatively, the State argued that even if all development of the tract east of Pittsburgh Avenue is prohibited, East Cape May has not been deprived of all economic use of its property because that tract and the previously developed tract west of Pittsburgh Avenue should be considered parts of a single property for the purpose of evaluating East Cape May's condemnation claim. The motion judge rejected that argument also. He said:

I am satisfied the land in question is owned by East Cape May Associates and that one or more of the principals may have also been principals in other entities owning nearby land. This other land is separated by a road owned by the City or the County from the parcel in question. While the owning entities have had common principals, the State has failed to show common ownership. The subject parcel cannot be considered for taking purposes as part of a larger parcel whereby the good land was developed leaving the remaining parcel subject to a claim of inverse condemnation because of its inutility.

The State also pointed to *N.J.S.A.* 13:9B–22b, which allows it to modify its denial of a permit to avoid a court ruling that the State is responsible to pay compensation for regulatory action which, if implemented, would amount to a constitutional taking. The State argued that until it had availed itself of that opportunity, no taking had occurred. The court rejected that argument, too, holding that although the State may relinquish property after taking it, there has already been at least a temporary taking.

The Law Division granted summary judgment. It held that there had been a regulatory taking of East Cape May's 100–acre property, and it entered a separate order "appoint[ing] Commissioners to make a just and equitable appraisement of the value of lands and premises described in the Complaint [and] to fix the compensation to be paid for the taking thereof as of the date of the commencement of this action...." It denied the State's

motion for reconsideration, but stayed the appointment of commissioners pending appeal to our court.

–1–

Governmental regulation which prohibits "all economically beneficial or productive use of land" is a "taking" for which just compensation is constitutionally required. *Lucas v. South Carolina Coastal Council,* 505 *U.S.* 1003, 1015–16, 112 *S.Ct.* 2886, 2893–94, 120 *L.Ed.*2d 798, 813–14 (1992) (regulation prohibiting building single-family homes on two beachfront lots was a regulatory taking); *see Bernardsville Quarry, Inc. v. Borough of Bernardsville,* 129 *N.J.* 221, 608 *A.*2d 1377 (1992); *Gardner v. New Jersey Pinelands Comm'n,* 125 *N.J.* 193, 205, 593 *A.*2d 251 (1991). In *Gardner v. New Jersey Pinelands Comm'n, supra,* the New Jersey Supreme Court declared that when a comprehensive regulatory scheme is claimed to have effected a "taking" for which the State and Federal Constitutions require compensation, "application of takings principles requires a fact-sensitive examination of the regulatory scheme, focusing on whether it substantially advances a legitimate public purpose and whether it excessively interferes with property rights and interests." 125 *N.J.* at 205, 593 *A.*2d 251. The *Gardner* plaintiff was held *not* to have suffered a taking because, unlike East Cape May in the present case, he "retain[ed] several viable, economically-beneficial uses of his land under the revised CMP [Pinelands Commission Comprehensive Management Plan]." *Id.* at 215, 593 *A.*2d 251.

The law of regulatory takings as it has been shaped by *Lucas* is aptly summarized as follows in *Loveladies Harbor, Inc. v. United States,* 28 *F.*3d 1171, 1179 (Fed.Cir.1994):

> With regard to the interest alleged to be taken, there has been a regulatory taking if
>
> (1) there was a denial of economically viable use of the property as a result of the regulatory imposition;
>
> (2) the property owner had distinct investment-backed expectations; and

(3) it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine.

The reference to "distinct investment-backed expectations" as an element of a regulatory taking derives from *Penn Central Transportation Co. v. City of New York*, 438 *U.S.* 104, 124, 98 *S.Ct.* 2646, 2659, 57 *L.Ed.*2d 631, 648 (1978). *Penn Central Transportation Co.* holds that New York City's designation of Grand Central Terminal as a historic landmark, which prevented its owner from erecting an office tower in the space above the terminal, did not constitute a regulatory taking. For regulatory action to constitute a taking, it must, among other things, interfere with the property owner's "distinct investment-backed expectations," and these expectations must be reasonable. *Id.* at 124–25, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648. Whether or not expectations are considered reasonable will depend to a significant extent on whether the property owner had notice in advance of its investment decision that the governmental regulations which are alleged to constitute the taking had been or would be enacted. *Ciampitti v. United States*, 22 *Cl.Ct.* 310, 320–21 (1991) (citing *Connolly v. Pension Benefit Guar. Corp.*, 475 *U.S.* 211, 227, 106 *S.Ct.* 1018, 1027, 89 *L.Ed.*2d 166, 180 (1986); *Ruckelshaus v. Monsanto Co.*, 467 *U.S.* 986, 1006–07, 104 *S.Ct.* 2862, 2874–75, 81 *L.Ed.*2d 815, 834–35 (1984)).

In the present case, Robinson and Brodesser clearly had "distinct, investment-backed expectations" before the effective date of CAFRA for the substantial development of their East Cape May property for housing. East Cape May is entitled to assert whatever development rights its predecessors would have had. *Cf. Nollan v. California Coastal Comm'n*, 483 *U.S.* 825, 833 n. 2, 107 *S.Ct.* 3141, 3147 n. 2, 97 *L.Ed.*2d 677, 687 n. 2 (1987) (holding that the present owners of the property are the transferees of their predecessors' full rights in the property so that the owners' rights are not diminished by their having acquired it after adoption of the regulation which effects the taking).

■ The pertinent DEP regulations, summarized above, which are applicable to East Cape May's property, indicate that, unless those regulations are relaxed in significant respects, no application for any economically meaningful development of that property will be granted. *Cf. Lucas, supra,* 505 *U.S.* at 1018, 112 *S.Ct.* at 2894–95, 120 *L.Ed.2d* at 814 ("affirmatively supporting a compensation requirement ... [are] regulations that leave the owner of land without economically beneficial or productive options for its use—typically ... by requiring land to be left substantially in its natural state"); *K & K Constr. v. Department of Natural Resources,* 217 *Mich.App.* 56, 551 *N.W.2d* 413, 417 (1996). If the property currently owned by East Cape May represents the full extent of the property which we should consider to determine the taking issue, *and if* those regulations will not be relaxed pursuant to *N.J.S.A.* 13:9B–22b, the State's regulatory scheme so "excessively interferes with property rights and interests" that they leave East Cape May without "viable, economically-beneficial uses of [its] land" and therefore have effected a constitutional taking. *See Gardner v. New Jersey Pinelands Comm'n, supra,* 125 *N.J.* at 210–16, 593 *A.2d* 251, and the cases cited therein.[1]

An affidavit submitted by the State in opposition to East Cape May's summary judgment motion suggests that minimal uses of

---

[1] *Lucas* suggests, but does not decide, that a regulatory taking which deprives an owner of most, but not all, of the economic value of his property entitles the owner to just compensation. 505 *U.S.* at 1019 n. 8, 112 *S.Ct.* at 2895 n. 8, 120 *L.Ed.2d* at 815 n. 8. Some courts appear to have adopted the suggested rule. *See Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal Va.,* 922 *F.Supp.* 1131, 1144–51 (W.D.Va.1996); *Florida Rock Indus. v. United States,* 18 *F.3d* 1560, 1568–73 (Fed.Cir.1994), *cert. denied,* 513 *U.S.* 1109, 115 *S.Ct.* 898, 130 *L.Ed.2d* 783 (1995). *But cf. Gardner v. New Jersey Pinelands Comm'n, supra,* 125 *N.J.* at 210–11, 593 *A.2d* 251 ("Diminution of land value itself does not constitute a taking. Similarly, impairment of the marketability of land alone does not effect a taking. Also, restrictions on uses do not necessarily result in takings even though they reduce income or profits. A regulatory scheme will be upheld unless it denies 'all practical use' of property or 'substantially destroys the beneficial use of private property....' " (citations omitted).) In any event, the applicable statutes and regulations as applied to the East Cape May property would prevent all viable economic uses.

the property might possibly be permitted on the East Cape May tract without resort to *N.J.S.A.* 13:9B–22b. Permitting any such minimal uses is not inconsistent with our conclusion that application of the regulations as written would deprive East Cape May of all economically viable uses of the property and would thereby amount to a taking. *See Lucas, supra,* 505 *U.S.* at 1044, 112 *S.Ct.* at 2908, 120 *L. Ed.*2d at 831 (Blackmun, J., dissenting) (pointing out that Lucas could legally put a trailer on each of his lots, camp out or picnic on them, or build some docking and walkways, but the majority considered that none of these uses was of sufficient economic benefit to avoid a taking). As our previous discussion of the applicable regulations indicates, they are so strict and comprehensive that, if applied in all their rigor to East Cape May's tract, they would entirely frustrate the developer's reasonable, investment-backed expectations for its property.

■ There is no need to exhaust administrative remedies when the pursuit of those remedies would be futile or illusory. *Cf. AMG Assocs. v. Township of Springfield,* 65 *N.J.* 101, 109 n. 3, 319 *A.*2d 705 (1974); *Verona, Inc. v. Mayor of the Borough of West Caldwell,* 49 *N.J.* 274, 285, 229 *A.*2d 651 (1967); *Deal Gardens, Inc. v. Board of Trustees,* 48 *N.J.* 492, 497, 226 *A.*2d 607 (1967). Consequently, no further resort to administrative remedies would be useful and none is therefore necessary except, as we will explain at greater length later in this opinion, to determine whether the DEP will waive any of its regulations pursuant to *N.J.S.A.* 13:9B–22b in order to permit development which would otherwise be prohibited.

■ The State argued to the motion judge and now argues to us that there has not yet been a compensable taking because of the safety-valve provisions of *N.J.S.A.* 13:9B–22b. That statute states:

> If the court determines that the issuance, modification, or denial of a freshwater wetlands permit by the department pursuant to this act constitutes a taking of property without just compensation, the court shall give the department the option of compensating the property owner for the full amount of the lost value, condemning the affected property pursuant to the provisions of the "Eminent

Domain Act of 1971," P.L.1971, c. 361 (C.20:3–1 et seq.), or modifying its action or inaction concerning the property so as to minimize the detrimental effect to the value of the property.

The motion judge ruled that the effect of this statute was to free the State "to modify or change its prior action ... without permission and/or Order of this Court.... thereby limit[ing] its liability to ... the period of time that [East Cape May] suffered a taking." The judge held, however, that even if the State modified its position pursuant to *N.J.S.A.* 13:9B–22b and permitted some development of the property, a "further delay in the appointment of [Condemnation] Commissioners is ... not required, because a compensable taking has occurred [and] [d]amages must be established at least for the period of taking or for a complete taking, depending on whether the State takes further action," citing *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 *U.S.* 304, 321, 107 *S.Ct.* 2378, 2389, 96 *L.Ed.*2d 250, 268 (1987).

We disagree that a taking has already occurred. One purpose of *N.J.S.A.* 13:9B–22b is obviously to avoid exposing the State to the risk of having to acquire property by the exercise of the power of eminent domain whenever an application for a development permit is denied. We are obligated to construe the statute to effectuate that purpose. It can and should be effectuated by interpreting the statute to mean that the administrative process leading to the issuance or denial of a development permit is not complete until the State has had the opportunity to decide whether the application of the regulations to a particular property should be relaxed pursuant to *N.J.S.A.* 13:9B–22b to avoid a taking. Constitutional considerations require us to construe the statute to also serve another purpose. The regulatory scheme governing properties like that at issue in the present case is extremely comprehensive and complex. It entrusts a very expansive discretion to the DEP. To require a developer to submit a multiplicity of successive applications in order to attempt to divine, without administrative guidance, what, if any, development of its property will be permitted would be inconsistent with due process of law. *Cf. Loveladies Harbor, Inc. v. United States,* 15 *Cl.Ct.* 381,

386 (1988) ("a party is not required to engage in piecemeal litigation to determine the type of development that will be allowed").

These two imperatives require us to construe *N.J.S.A.* 13:9B–22b as if it read:

> If the court [or the DEP] determines that the issuance, modification, or denial of a freshwater wetlands permit by the department pursuant to this act *would consti-tute* a taking of property without just compensation, the court shall give the department the option of . . .

In other words, the statute requires the DEP and the developer to confer about the realistic prospects for development whenever the agency has taken a position which, reasonably interpreted, would impose limits on the utilization of property so draconian that they would amount to a constitutional taking. *Cf. N.J.S.A.* 13:9B–2 ("that in order to advance the public interest in a just manner the rights of persons who own or possess real property affected by this act must be fairly recognized and balanced with environmental interests"). An exchange of views and information is required as part of the administrative process, leading to the agency's communicating to the developer a reliable, authoritative indication of what kind of development, if any, will be permitted and under what conditions. *Cf. In re Loveladies Harbor, Inc.,* 176 *N.J.Super.* 69, 73, 422 *A.*2d 107 (App.Div.1980), *certif. denied,* 85 *N.J.* 501, 427 *A.*2d 588 (1981), where we refrained from deciding whether, in the abstract, the DEP's denial of a fill permit would be a taking because "the Division suggested a possible alternative plan for development of a portion of the property. . . ." We hold that *N.J.S.A.* 13:9B–22b contemplates and requires this mutual effort and administrative guidance and that it is part of the administrative process contemplated by the applicable regulatory scheme. Until the developer has sought and obtained the requisite guidance from the DEP, or the DEP has failed or refused to provide it, no permanent taking has occurred. Such a reliable, authoritative indication of what development will be permitted is required in this case.

*First English Evangelical Lutheran Church v. County of Los
Angeles, supra,* which the motion judge cited for the proposition
that there has been at least a temporary taking for the period
since East Cape May's commencement of the present suit, does
not support that conclusion. The United States Supreme Court
ruled in that case that after a public body has taken private
property, the action may be rescinded and the property may be
returned to its owner, but the fact of the taking cannot be undone.
Consequently, even if the property is returned, the property
owner will be owed fair compensation for a temporary taking.
The Court did not decide when a taking occurs, or that delays
incidental to a regulatory process constitute a temporary taking.
In fact, the Court said, "We ... of course do not deal with the
quite different questions that would arise in the case of normal
delays in obtaining building permits, changes in zoning ordinances,
variances, and the like which are not before us." 482 *U.S.* at 321,
107 *S.Ct.* at 2389, 96 *L.Ed.*2d at 268. *See Tabb Lakes, Ltd. v.
United States,* 10 *F.*3d 796, 800 (Fed.Cir.1993) (noting that tempo-
rary taking of property entitles owner to compensation, but hold-
ing that mere "cease and desist" order preventing filling of
wetlands did not constitute temporary taking, where permit allow-
ing construction might be granted).

 If the end result of the process of applying for development
permits is to allow reasonable utilization of the East Cape May
property, the developer will not necessarily be entitled to compen-
sation for the delay between the initial denial of its application and
the ultimate issuance of a development permit. The process of
applying for a development permit and satisfying the DEP's
requirements for its issuance is necessarily protracted. The delay
incident to the process, like any other burden of permissible
regulation, is a burden inherent in the ownership of property and
not a constitutional taking. *Tabb Lakes, Ltd. v. United States,
supra,* 10 *F.*3d at 801 (citing *United States v. Riverside Bayview
Homes, Inc.,* 474 *U.S.* 121, 126–27, 106 *S.Ct.* 455, 458–59, 88
*L.Ed.*2d 419, 426 (1985)); *1902 Atlantic Ltd. v. United States,* 26

*Cl.Ct.* 575, 581–82 (1992). Even if we assume that an unduly protracted application process might constitute a temporary taking, there is no basis in the present summary judgment record for concluding that, as a matter of law, the duration of the process in this case has been, or will have been, so disproportionate to the complexity of the regulatory scheme that the process itself was the equivalent of a temporary taking of the property. *Cf. Schiavone Const. Co. v. Hackensack Meadowlands Dev. Comm'n,* 98 *N.J.* 258, 486 *A.*2d 330 (1985) (court must consider reasonableness of duration of any moratorium on development when determining whether partial taking has occurred); *Toms River Affiliates v. Department of Envtl. Protection,* 140 *N.J.Super.* 135, 148, 355 *A.*2d 679 (App.Div.), *certif. denied,* 71 *N.J.* 345, 364 *A.*2d 1077 (1976) (no taking, either temporary or permanent, where CAFRA permit denied but other acceptable uses of property existed); *Meadowland Reg'l Dev. Agency v. Hackensack Meadowlands Dev. Comm'n,* 119 *N.J.Super.* 572, 293 *A.*2d 192 (App.Div.), *certif. denied,* 62 *N.J.* 72, 299 *A.*2d 69 (1972) (temporary taking does not occur during interim regulation period freezing development). On remand, the trial judge should consider anew whether there has been a temporary taking in the interval since the denial of the development application or the filing of the complaint in this case.

–2–

We turn next to consider the State's argument that East Cape May has not been deprived of substantially all beneficial use of its property because the relevant "property" includes its principals' 100–acre tract west of Pittsburgh Avenue. This contention raises the issue that cases and legal commentators have described as the problem of defining the "denominator." The term "denominator" appears to have been first used in this context in *Keystone Bituminous Coal Association v. DeBenedictis,* 480 *U.S.* 470, 497, 107 *S.Ct.* 1232, 1247–48, 94 *L.Ed.*2d 472, 496 (1987), where the Court explained,

Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of

the critical questions is determining how to define the unit of property "whose value is to furnish the denominator of the fraction."

(citing Frank I. Michelman, *Property, Utility and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 *Harv. L.Rev.* 1165, 1192 (1967)). Again referring to the "denominator" in this context, the Court said in *Lucas, supra:*

> Regrettably, the rhetorical force of our "deprivation of all economically feasible use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole.... Unsurprisingly, this uncertainty regarding the composition of the *denominator* in our "deprivation" fraction has produced inconsistent pronouncements by the Court....
>
> [505 *U.S.* at 1016 n. 7, 112 *S.Ct.* at 2894 n. 7, 120 *L.Ed.*2d 798, 813 n. 7 (emphasis added).]

In this usage, the "numerator" of the "deprivation" or "taking fraction" is the property whose use the owner claims to have been deprived of. If the denominator of the "taking fraction" is the same as the numerator, the owner has been deprived of all beneficial economic use of his property, there has been a taking, and the owner is entitled to fair compensation. *Lucas, supra,* 505 *U.S.* at 1015–19, 112 *S.Ct.* at 2893–95, 120 *L.Ed.*2d at 813–15. If the "denominator" is larger than the "numerator," the owner has been deprived of less than all of his property rights. If this deprivation has resulted from a non-transitory, physical invasion of the property, the owner has suffered a taking and is entitled to fair compensation for a partial loss. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 *U.S.* 419, 435–40 & n. 16, 102 *S.Ct.* 3164, 3175–79 & n. 16, 73 *L.Ed.*2d 868, 882–85 & n. 16 (1982) (requiring landlords to allow television cable companies to place cable facilities in their buildings effected a taking even though the facilities occupied only one and one-half cubic feet of space). But if a governmental regulation has deprived the owner of the use of only part of his property, the majority view has been that he is not entitled to any compensation. *See, e.g., Penn*

*Central Transportation Co. v. City of New York,* 438 *U.S.* 104, 98
*S.Ct.* 2646, 57 *L.Ed.*2d 631 (1978)(landmark designation deprived
owner of use of air rights); *Keystone Bituminous Coal Associa-
tion, supra* (legislation to protect buildings against subsidence
required owners of coal mines to leave certain amount of coal in
mines).

■ In the present case, the State contends that the denomina-
tor of the taking fraction is the entire 200 acres which it alleges
are owned by East Cape May and its principals on both sides of
Pittsburgh Avenue. East Cape May's first response to this
argument is that the State is estopped to assert it because the
argument is inconsistent with the final judgment in prior litigation.
The following are the facts pertinent to that contention. In 1988,
the DEP brought suit against Robinson and Brodesser to enjoin
them from filling wetlands and building on a portion of their
property east of Pittsburgh Avenue. They defended on the
ground that CAFRA exempted them from its permitting require-
ments because their property to the east of Pittsburgh Avenue
was part of a larger tract that included the property to the west of
the avenue on which construction had begun prior to the effective
date of CAFRA. The Chancery Division entered judgment for
the State, holding that the developers were not entitled to "grand-
father" status.

The statute on which Robinson and Brodesser relied for that
claim was *L.* 1973, *c.* 185, § 5 (effective Sept. 18, 1973), (codified at
*N.J.S.A.* 13:19–5, amended by *L.* 1993, *c.* 190, § 5). It read as
follows:

> No person shall construct or cause to be constructed a facility in the coastal area
> until he has applied for and received a permit issued by the commissioner;
> however, the provisions of this act shall not apply to facilities for which on-site
> construction, including site preparation, was in process on or prior to the effective
> date of this act.

The Law Division ruled that under the terms of this statute,
construed in the light of CAFRA's purpose, the construction of
housing units on the west side of Pittsburgh Avenue did not
exempt the proposed construction on the east side of the avenue

from CAFRA's requirements. That decision was clearly correct. Whatever the term "facility" may mean in the quoted statute, it does not encompass two large parcels of 70 to 100 acres each, separated by a county road. However, this ruling does not shed any light on whether the land directly or indirectly owned by East Cape May's principals on both sides of a county road should be considered a single property for the purpose of determining whether the DEP regulations applicable to the land east of the avenue have deprived East Cape May of substantially all economically viable use of its property. Consequently, we reject East Cape May's judicial estoppel argument. That still leaves us with having to determine the proper denominator of the taking fraction in this case.

Without mentioning "denominator", two reported New Jersey cases expressly note how much of a claimant's property should be considered part of the denominator of the taking fraction in cases where plaintiffs claimed regulatory takings. *See American Dredging Company v. State Dep't of Envtl. Protection*, 169 *N.J.Super.* 18, 404 *A*.2d 42 (App.Div.1979), *aff'g* 161 *N.J.Super.* 504, 391 *A*.2d 1265 (Ch.Div.1978); *In re Loveladies Harbor, Inc., supra*, 176 *N.J.Super.* 69, 422 *A*.2d 107. Both cases were decided before *Lucas*. Both assume, without discussion of the issue, that the denominator of the taking fraction should include all of the contiguous acreage under a single ownership.

At least one New Jersey Supreme Court case suggests otherwise. *See Morris County Land Improvement Co. v. Township of Parsippany–Troy Hills*, 40 *N.J.* 539, 193 *A*.2d 232 (1963). The plaintiff in that case owned sixty-six undeveloped acres of wetlands (at that time, called "swampland") in Parsippany–Troy Hills. According to the opinion, "[t]his acreage is part of a large tract, the balance of which is located across [Perrine Road, a dirt highway,] in Hanover," the adjoining municipality. *Id.* at 543, 193 *A*.2d 232. Plaintiff operated a sand and gravel business on the Hanover portion of the property "and has filled in the swampy portion of its property in that township with overburden and other

unusable material from the sand and gravel pit." *Ibid.* The portion of the property in Parsippany–Troy Hills was subject to a zoning classification which precluded any use of the property except for agriculture, conservation and similar uses, radio or television transmitting stations, and water and sewage treatment plants. No filling was allowed except by the use of material taken from within the zone. *Id.* at 545–46, 193 *A.*2d 232. The Court found that the purpose and effect of the ordinance was to retain the land in its natural state to serve as a water retention basin in aid of flood control and to preserve the land as open space. *Id.* at 551–53, 193 *A.*2d 232. The Court held that this zoning, if unmodified, would constitute a taking of private property requiring fair compensation. *Id.* at 554–59, 193 *A.*2d 232.

Subsequent decisions have questioned whether *Morris County Land Improvement Co.* is still good law in all respects. *See Gardner v. New Jersey Pinelands Comm'n, supra,* 125 *N.J.* at 213–14, 593 *A.*2d 251, and *AMG Assocs. v. Township of Springfield,* 65 *N.J.* 101, 112 n. 4, 319 *A.*2d 705 (1974). However, the significant aspect of *Morris County Land Improvement Co.* for the present case is that the Court assumed the plaintiff's sixty-six acres on the Parsippany–Troy Hills side of the highway was the entire property, the denominator of the taking fraction, and did not consider the larger adjoining tract in Hanover. *See also AMG Associates v. Township of Springfield, supra,* a split-lot zoning case in which the court appears to have assumed that the denominator of the taking fraction was the part of the owner's property whose utility was destroyed by the zoning ordinance.

The majority of out-of-state cases which have considered the composition of the denominator of the taking fraction have held that it consists of all of the claimant's contiguous acreage in the same ownership. *See Jentgen v. United States,* 228 *Ct.Cl.* 527, 657 *F.*2d 1210 (1981), *cert. denied,* 455 *U.S.* 1017, 102 *S.Ct.* 1711, 72 *L. Ed.*2d 134 (1982) (restrictions on development of wetlands prevented owner of 100 acres from using all but 20 acres of uplands, not subject to permit requirements, and 20 acres of wetlands for which

permit was granted; held, no taking); *Deltona Corp. v. United States*, 228 *Ct.Cl.* 476, 657 *F.*2d 1184 (Ct.Cl.1981), *cert. denied*, 455 *U.S.* 1017, 102 *S.Ct.* 1712, 72 *L. Ed.*2d 135 (1982) (owner who lost thirty-three percent of projected development as the result of enforcement of Clean Water Act did not suffer a taking); *Broadwater Farms Joint Venture v. United States*, 35 *Fed. Cl.* 232 (1996)(enforcement of wetlands and Clean Water Act regulations which prevented owner from using twelve of twenty-seven lots did not effect a taking); *Volkema v. Department of Natural Resources*, 214 *Mich.App.* 66, 542 *N.W.*2d 282 (1995) (where wetlands legislation made 6 acres out of a 24.6–acre tract unusable, tract would be considered as a whole and there was no taking); *Zealy v. City of Waukesha*, 201 *Wis.*2d 365, 548 *N.W.*2d 528 (1996) (8.2 acres of a 10.4 acre tract were rezoned so that only farming was permitted; all 10.4 acres would be viewed as a single property and the consequent diminution in value was not enough to constitute a taking).

The justification for the rule exemplified by these cases is, as Justice Holmes observed in *Pennsylvania Coal Company v. Mahon*, 260 *U.S.* 393, 413, 43 *S.Ct.* 158, 159, 67 *L.Ed.* 322, 325 (1922), that "Government hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law." Cases adopting that rule generally quote the proposition asserted in *Penn Central Transportation Co., supra*, quoted with approval in *Keystone Bituminous Coal Association, supra*, 480 *U.S.* at 497, 107 *S.Ct.* at 1248, 94 *L.Ed.*2d at 496, that

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole—here, the city tax block designated as the "landmark site."
> [438 *U.S.* at 130–31, 98 *S.Ct.* at 2662, 57 *L.Ed.*2d at 652.]

However, the "segment[ ]" of "a single parcel" which the Court refused to consider separately in the *Penn Central Transportation Co.* case was not a fee simple interest; it was the air rights

above Grand Central Terminal. 438 *U.S.* at 130, 98 *S.Ct.* at 2662, 57 *L.Ed.*2d at 652. The property interest at issue in *Keystone Bituminous Coal Association* was a support estate, an interest which the opinion characterized as peculiar to Pennsylvania law. 480 *U.S.* at 500–02, 107 *S.Ct.* at 1249–50, 94 *L.Ed.*2d at 497–99.

In *Lucas, supra,* the Court did not have to decide how "property" should be delimited in a regulatory taking case because it held that South Carolina's beachfront regulation had deprived the plaintiff of all economic use of both of his two beachfront lots. But in *dicta,* the Court questioned whether a regulation which required ninety percent of a rural tract to be left in its natural state should be analyzed as a case "in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole." 505 *U.S.* at 1016 n. 7, 112 *S.Ct.* at 2894 n. 7, 120 *L.Ed.*2d at 813 n. 7. Noting that the decision of the New York Court of Appeals which the Supreme Court reviewed in the *Penn Central Transportation Co.* case had "examined the diminution in a particular parcel's value produced by a municipal ordinance in light of [the] total value of the taking claimant's other holdings in the vicinity," the Court characterized that view as "an extreme ... and ... unsupportable ... view of the relevant calculus." *Ibid.*

Some of the cases decided subsequent to *Lucas* have read the opinion in that case as signaling a change in the law of regulatory takings. They have ruled that when a law or regulation which is not limited to proscribing common-law nuisances has prohibited all viable economic uses of a material part of substantial, contiguous acreage owned by the same titleholder, the owner is entitled to fair compensation for the land subject to the law or regulation, even though the owner continues to benefit from the remaining portion of its property. In other words, they have held that, in some situations, the denominator of the taking fraction is the portion of the property subject to the confiscatory regulation.

The first of these cases is *Loveladies Harbor, Inc. v. United States,* 28 *F.*3d 1171 (Fed.Cir.1994). Loveladies Harbor, Inc. owned a 51–acre parcel that was originally part of a 250–acre tract which Loveladies acquired in 1958. *Id.* at 1174. All of that 250–acre tract except the remaining 51 acre-parcel had been developed and all but 6.4 acres of the 199 developed acres had been sold by Loveladies. *Id.* at 1180. In return for Loveladies' imposing deed restrictions against filling or developing 38.5 acres of wetlands within its 51–acre parcel, the New Jersey DEP issued it a permit to fill 11.5 acres of wetland and to build 35 single-family homes on that property and on one additional acre of already filled land. *Id.* at 1174 & n. 6. At the DEP's urging, however, the Army Corps of Engineers denied Loveladies a federal permit which was the remaining prerequisite for developing the 12.5 acres. Loveladies filed a claim against the Federal Government for just compensation under the takings clause of the Fifth Amendment, and the Court of Federal Claims found that the fair value of the 12.5 acres was $2,658,000 before the permit denial and $12,500 thereafter. *Id.* at 1174–75.

On appeal, the Federal Circuit Court of Appeals confronted the "denominator" issue. The Government contended that the relevant property, the denominator, was either Loveladies' original 250–acre parcel or the 51 acres which it still owned when the permit was denied. *Id.* at 1180. Loveladies argued that the denominator of the takings fraction was the 11.5 acres for which it had sought a permit. *Id.* at 1181.

The Court of Appeals agreed with Loveladies. The court rejected the contention that the entire original 250–acre parcel should be considered as the denominator of the takings fraction:

> Our precedent displays a flexible approach, designed to account for factual nuances....
>
> These factual nuances include consideration of the timing of transfers in light of the developing regulatory environment. New Jersey apparently made no effort to impose restrictions on the development of this wetland area until after the initial project had been approved for development, and until 199 acres had been developed. This development occurred over a substantial period of years beginning in 1958, and involved many kinds of government permits. The trial court concluded

that land developed or sold before the regulatory environment existed should not be included in the denominator. The Government has failed to convince us that the trial court clearly erred in this conclusion.

[*Id.* at 1181.]

The Court of Appeals also declined to include the 38.5 acres on which development restrictions were imposed by deed in exchange for the New Jersey DEP permits:

With regard to the land remaining after the regulatory fabric was in place, the trial court excluded from consideration the 38.5 acres which for all practical purposes had been promised to New Jersey in exchange for the NJDEP permit. This is only logical since whatever substantial value that land had now belongs to the state and not to Loveladies.

[*Ibid.*]

That analysis led the court to the conclusion that "the relevant property for the takings analysis is the 12.5 acres, for which the trial court found the remaining value to be de minimis." *Ibid.* Consequently, the Court of Appeals held, Loveladies had been "deprived of all economically feasible use" of the "relevant parcel," and the permit denial was "effectively a total taking of the property owner's interest in these acres. . . ." *Id.* at 1182.

In *K & K Construction, Inc. v. Department of Natural Resources*, 217 *Mich.App.* 56, 551 *N.W.2d* 413 (1996), the denial of a permit for the development of twenty-eight acres of wetlands prevented plaintiffs from building a restaurant on a fifty-five-acre parcel of land which included the wetlands. Related parties owned that parcel and three others which, together, totalled eighty-two acres. *Id.* 551 *N.W.2d* at 415. The property owners contended that the state had taken the twenty-eight wetland acres and that only that property should be considered to determine whether there had been a taking. The state argued that the issue for determination was whether prohibiting development on twenty-eight out of eighty-two acres constituted a taking. *Id.* at 418. The trial court held that the relevant property was the fifty-five acres; that because of its configuration, the presence of the wetlands made all of the fifty-five-acre parcel unusable for any commercial use; and all of it had therefore been taken. *Id.* at 418–19. After that determination by the trial court, the State

accepted an alternative development plan proposed by the property owners. *Id.* at 420. Under that plan, the owners would fill approximately 3.17 acres of wetlands, convert 5.36 acres of upland to wetlands, and then be able to construct the restaurant by using portions of parcels 1, 2 and 4. *Id.* at 416. In a second opinion, the trial court held that there had been a temporary taking of the entire fifty-five acres during the interval between the denial of a permit for the original development plan and the grant of a permit for the alternative plan, and that there had also been a permanent taking of the smaller portion of parcel 1 which could not be used even under the alternative plan. *Id.* at 420.

The Michigan Court of Appeals affirmed the trial court's decision. The appellate court agreed that the denominator of the taking fraction for the taking effected by the initial denial of the permit was the fifty-five-acre parcel, not the eighty-two acres inclusive of the related parcels, because the owners of the several parcels, although related, were not identical; only the fifty-five-acre parcel was directly affected by the wetlands regulation; and only that parcel was zoned for commercial use, while the others were zoned for residential use. But the court held that the initial denial of the permit to build on the twenty-eight acres of wetlands constituted a taking of the entire fifty-five acres because the configuration of the property made the unprotected upland essentially worthless as commercial property. *Id.* at 418–19. Significantly for the issue of defining the denominator of the taking fraction, the Court of Appeals also agreed that even after the state's issuance of a permit for development in accordance with the owners' alternative plan permitted utilization of a substantial part of parcel 1, there had been a permanent taking of that portion of the fifty-five acres which remained unusable because they continued to be protected wetlands. *Id.* at 419–20.

In *Volkema v. Department of Natural Resources*, 214 *Mich. App.* 66, 542 *N.W.2d* 282 (1995), property owners were denied a permit to fill 4.3 acres of wetlands that formed part of a 24.6–acre parcel. That parcel had originally been held as part of a tract of

forty-five contiguous acres. The owners contended that denying them their fill permit made six acres of their property useless. The trial court held that because only approximately a quarter of the 24.6–acre tract was affected, the owners had suffered a diminution in value of their property, but not a taking. The Michigan Court of Appeals agreed. *Id.* 542 *N.W.*2d at 283.

Relying to some extent on *Loveladies Harbor, Inc. v. United States, supra,* 28 *F.*3d 1171, the Michigan appellate court ruled that the *Volkema* property owners' original forty-five acres should not be considered to form the takings denominator because approximately half of it had already been developed before the enactment of the legislation under which the fill permit had been denied. However, the court also held that there was no reason to limit the denominator to the affected six acres, excluding the 18.6 acres the property owners still retained when the permit was denied, because the remaining 18.6 acres would continue to have substantial value. In that respect, the court pointed out, the land retained by the *Volkema* property owners differed significantly from the 38.5 acres retained by the property owners in *Loveladies,* which was essentially valueless to them because of the deed restrictions which they had impressed on the property at the insistence of the New Jersey DEP. 542 *N.W.*2d at 284–85.

These cases indicate the presently unsettled state of New Jersey and Federal law on the question of how to determine the relevant "property" for the purpose of deciding whether police power statutes or regulations like those at issue in the present case have deprived the owner of substantially all viable economic use of its property. They also illustrate the significance of the particular facts of each case. Determining the takings denominator in the present case requires a much more complete factual record than now exists. What entities own or owned the property west of Pittsburgh Avenue? What part of it, if any, do those entities still retain? When did they build on it and when were any parts of it disposed of? What is the relationship of East Cape May to the entities which own or owned the property west of

Pittsburgh Avenue? When and for what consideration was the land on either side of Pittsburgh Avenue acquired? When, why, and for what consideration was the property east of Pittsburgh Avenue transferred to its present ownership? What part of the property west of Pittsburgh Avenue was subject to wetlands controls or other governmental restrictions while it was owned by East Cape May's principals or transferors? What is the current municipal zoning of the property? Is there any difference in the zoning applicable to the land east and west of Pittsburgh Avenue? Was development restricted to the western tract in anticipation of the more stringent regulations applicable to the eastern part? The answers to all of these questions may affect the formulation of the rule for the definition of the "property" which is relevant to East Cape May's claim that its property has been deprived of all viable economic uses. Undoubtedly, as the parties attempt to marshall data to support one definition or another, the relevance of other facts will also become apparent. We conclude, therefore, that this case was not ripe for summary judgment on the present record.

We therefore reverse the orders appealed from and remand this matter to the trial court for further proceedings not inconsistent with this decision. At the option of the DEP, an opportunity should be afforded it to work with East Cape May to formulate an acceptable development plan pursuant to *N.J.S.A.* 13:9B–22b.

Reversed.